2009 UT 42

**STATE of Utah, Plaintiff and Appellee,**

v.

**James M. GALLEGOS, Defendant and Appellant.**

No. 20070212.

Supreme Court of Utah.

July 21, 2009.

Rehearing Denied Nov. 17, 2009.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Paul G. Amann, Asst. Att'ys Gen., Salt Lake City, for plaintiff.

Kenneth R. Brown, Ann Marie Taliaferro, Salt Lake City, for defendant.

WILKINS, Justice:

¶ 1 Defendant James M. Gallegos asks us to reverse his criminal convictions for two counts of enticing a minor over the internet, alleging several points of error below. Specifically, Gallegos argues that Utah's Internet Enticement Statute (the enticement statute) is unconstitutionally vague, both facially and as applied to him. Gallegos also contends that the trial court erred in reversing a pretrial decision to allow him to present a voluntary termination affirmative defense. Additionally, Gallegos argues that the trial court erred in denying his motion to suppress statements he made regarding the destruction of his computer and in excluding his proposed expert testimony on relevancy grounds. Finally, Gallegos argues that the cumulative damage of these errors warrants a vacation of his sentence or a remand for a new trial. We disagree and, therefore, affirm.

## BACKGROUND

¶ 2 In March 2006, Lieutenant Jessica Eldredge of the Internet Crimes Against Children Task Force (ICAC) was conducting an undercover operation on the internet in search of child predators. Eldredge was posing as a thirteen-year-old girl named "Chantel," and included an age-appropriate photograph on her profile page. On March 16, 2006, Eldredge entered Yahoo! Utah chatroom and waited for someone to contact "Chantel."

¶ 3 Several individuals contacted Chantel that day, including Gallegos. When Gallegos inquired about Chantel's age, she told him that she was thirteen years old. Gallegos informed Chantel that he was a 28–year–old male from Clearfield and stated that he was "to[o] old" for her. Despite this acknowledgment, their online dialogue continued, eventually progressing to a discussion in which Gallegos proposed that Chantel provide him sexual favors in exchange for the use of his car. Shortly after this discussion, the conversation ended.

¶ 4 Eldredge returned to the Yahoo! chatroom on March 23, 2006. Sometime after Eldredge signed on, Gallegos contacted Chantel and resumed their conversation. Eventually, Gallegos and Chantel engaged in a graphic sexual conversation. This time, however, the conversation culminated in an agreement to meet in the parking lot of Union Middle School for the proposed sexual activity. Before signing off of the chatroom, Gallegos confirmed their plans, saying, "ok see you there ... make sure you show up ... cause I am...."

¶ 5 After Eldredge logged off her computer and briefed the ICAC team, eight officers went to various locations near Union Middle School to wait for Gallegos to arrive. At approximately 10:30 p.m., one of the officers spotted Gallegos' car near the school. Other officers also noticed Gallegos approach the school, then slow down as he passed the parking lot. The officers then saw Gallegos turn around and pass the school two more times. At this point, Gallegos apparently spotted some of the officers parked by the school and sped off into a residential neighborhood. The officers chose to not pursue the car and, instead, returned to police headquarters.

¶ 6 After obtaining a photograph of Gallegos, six officers drove to the Ogden address that appeared on his driver license. The officers verified that the home belonged to Gallegos' wife and knocked on the door. Gallegos' wife informed them that Gallegos had moved out and gave them his current address in Clearfield, Utah. The officers then proceeded to Gallegos' Clearfield apartment.

¶ 7 While the officers were still en route to Clearfield, Gallegos, who had been tipped off by his wife, telephoned Eldredge and told her that he "was really scared" and "didn't know what to do." He also asked if he was "going to go to jail." Eldredge told him that she did not know whether he would be arrested and asked him to meet her at his apartment. Gallegos complied and per his request, met the officers at the clubhouse of his apartment complex.

¶ 8 When Gallegos arrived, Eldredge directed him where to park, and an SUV and a police vehicle pulled in directly behind him with their back lights flashing. Eldredge then instructed Gallegos to get out of his car while keeping his hands visible. As he got out of the car, six to seven officers walked toward him and began surrounding him. Some of the officers had police vests on, while others simply wore badges around their necks. After officers patted him down for weapons, Gallegos placed his car keys and other items inside his car. Eldredge then asked him for his computer. Gallegos responded that because he was afraid, he had

thrown it out at a friend's garbage can. At this point, officers read Gallegos his *Miranda* rights, and he invoked his right to remain silent and his right to an attorney.

¶ 9 Gallegos was subsequently charged with two felony counts of enticing a minor over the internet in violation of Utah Code section 76–4–401 (2008). The case proceeded to trial, and Gallegos filed a motion to dismiss on the grounds that the enticement statute was unconstitutional both facially and as applied to him. The trial court denied the motion. Gallegos also filed a motion to suppress the computer statements based on *Miranda* violations. The trial court again denied the motion, concluding that Gallegos was not being interrogated at the time he made the statements. Gallegos then proposed using a voluntary termination defense, which the trial court initially stated "was perfectly legitimate"; at the close of the trial, however, the trial court refused to give a jury instruction based upon voluntary termination. Finally, the State filed a motion in limine to exclude Gallegos' expert witness, Dr. Peter Byrne, arguing that his testimony was irrelevant. The trial court granted the motion. Gallegos now appeals each of those decisions, arguing that the cumulative damage of these errors warrants a vacation of his sentence or a remand for a new trial.

## STANDARDS OF REVIEW

¶ 10 Gallegos first argues that Utah's internet enticement statute is unconstitutionally vague. Constitutional challenges to statutes present questions of law, which we review for correctness. *See State v. MacGuire*, 2004 UT 4, ¶ 8, 84 P.3d 1171. Gallegos next contends that the trial court erred in failing to present a voluntary termination instruction for the jury. "A trial court's refusal to give a jury instruction presents a question of law, which [this court] review[s] for correctness, giving no particular deference to the trial court." *State v. Quada*, 918 P.2d 883, 885 (Utah Ct. App. 1996).

¶ 11 Gallegos next argues that the trial court erred in denying his motion to suppress the statements he made about his computer based on *Miranda* violations. Be-

cause of the "importance of uniformity in Utah courts' application of Fifth Amendment *Miranda* protections ... [we] review for correctness trial courts' custodial interrogation determinations." *State v. Levin*, 2006 UT 50, ¶ 16, 144 P.3d 1096.

■ ¶ 12 Finally, Gallegos avers that the trial court erred in excluding his proposed expert testimony on relevancy grounds. A trial court's denial of a party's presentation of expert testimony under Rule 702 of the Utah Rules of Evidence is reviewed under an abuse of discretion standard. *See State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794. "Under this standard, we will not reverse [a decision to admit or exclude expert testimony] unless the decision exceeds the limits of reasonability." *Id.* (alteration in original) (internal quotation marks omitted).

## ANALYSIS

### I. CONSTITUTIONALITY OF UTAH'S INTERNET ENTICEMENT STATUTE

¶ 13 Gallegos claims that the enticement statute under which he was charged is unconstitutionally vague both facially and as applied to him because it does not put him, nor anyone else, on notice of the point at which the crime is completed. *See* Utah Code Ann. § 76–4–401 (2008). Until now, this court has not had the opportunity to examine the constitutionality of the enticement statute. Instead, the last word came from the court of appeals in *State v. Ansari*, where the court noted, albeit in dicta, that "the terms of the [enticement] statute are sufficiently precise. . . . Accordingly, we would conclude that [the statute] is not unconstitutionally vague." 2004 UT App 326, ¶ 45 n. 6, 100 P.3d 231. Although the court of appeals used strong language suggesting it would uphold the statute as constitutional, this case presents an issue of first impression for this court.

■ ¶ 14 "A statute may be unconstitutional either on its face or as applied to the facts of a given case." *State v. Herrera*, 1999 UT 64, ¶ 4 n. 2, 993 P.2d 854. "When asserting an as-applied challenge, the party claims that, under the facts of his particular case, the statute was applied ... in an unconstitu-

tional manner." *Ansari*, 2004 UT App 326, ¶ 27, 100 P.3d 231 (omission in original) (internal quotation marks omitted). In contrast, when a party presents a facial challenge, he seeks to " 'vindicate not only his own rights, but those of others who may be adversely impacted by the statute in question.' " *Id.* (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55–56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)). Furthermore, in asserting a facial challenge, the party avers that "the statute is so constitutionally flawed that no set of circumstances exists under which the [statute] would be valid." *Id.* (alteration in original) (internal quotations marks omitted). However, if a "statute ... is clear as applied to a particular complainant [it] cannot be considered impermissibly vague in all of its applications and thus will necessarily survive a facial vagueness challenge." *State v. MacGuire*, 2004 UT 4, ¶ 12, 84 P.3d 1171. In other words, if Gallegos' as-applied challenge of the enticement statute fails, so does his facial attack.

■ ¶ 15 When a party raises a vagueness challenge, courts look at two factors to determine constitutional validity. "A statute is impermissibly vague if it either (a) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (b) 'authorizes or even encourages arbitrary and discriminatory enforcement.' " *Ansari*, 2004 UT App 326, ¶ 42, 100 P.3d 231 (quoting *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)).

■ ¶ 16 Under the first prong of the vagueness test, Gallegos argues that the statute does not provide notice because a person of ordinary intelligence cannot know whether the offense is complete when the person actually meets the minor, takes any step to meet the minor, or whether the "chat alone" is sufficient. The meaning of the statute, however, is not subject to the confusion Gallegos suggests. Pursuant to the plain language of the statute, a person is guilty of enticing a minor over the internet if he or she "knowingly uses a computer to solicit, seduce, lure, or entice ... a minor or a person the defendant believes to be a minor

to engage in any sexual activity which is a violation of state law." Utah Code Ann. § 76–4–401. The words used to describe the proscribed conduct are both commonly used and clearly defined.[1] In fact, "[t]he likelihood that anyone would not understand any of [these] common words seems quite remote," *Hill*, 530 U.S. at 732, 120 S.Ct. 2480; *see also United States v. Dhingra*, 371 F.3d 557, 562 (9th Cir.2004) (holding that "the terms 'persuade,' 'induce,' 'entice,' and 'coerce,' . . . have a plain and ordinary meaning"), and Gallegos cannot simply "inject doubt as to the meaning of words where no doubt would be felt by the normal reader." *MacGuire*, 2004 UT 4, ¶ 18, 84 P.3d 1171 (internal quotation marks omitted).

¶ 17 Accordingly, contrary to Gallegos' position, we see nothing in the enticement statute that suggests the offense is completed only if a meeting occurs. Instead, the statute is clear that the crime is committed as soon as the defendant "solicits" or "entices" a minor to engage in unlawful sexual activity. Nothing more is required. The crime is committed at the keyboard.

¶ 18 Gallegos also argues that if this court concludes that the "chat alone" constitutes the crime, then the enticement statute violates the First Amendment. While we have not addressed this specific issue, courts in other jurisdictions have analyzed whether the federal version of the enticement statute violates the First Amendment. Overwhelmingly, courts have concluded that it does not. *See, e.g., United States v. Tykarsky*, 446 F.3d 458, 473 (3rd Cir.2006) ("There is no First Amendment right to persuade minors to engage in illegal sex acts."); *State v. Colosimo*, 122 Nev. 950, 142 P.3d 352, 356 (2006) (hold-

ing that Nevada's internet enticement statute does not violate the First Amendment).

■ ¶ 19 Utah's enticement statute prohibits an individual from "solicit[ing], seduc[ing], lur[ing], or entic[ing]" a known minor to actually *engage* in unlawful sexual activity. Utah Code Ann. § 76–4–401(2)(b)(ii). We conclude that such speech is not afforded First Amendment protections.

■ ¶ 20 Under the second prong of the test, whether the statute has the potential to be applied in an arbitrary or discriminatory manner, we conclude that it does not. It is true that Eldredge testified at trial that many individuals contact "Chantel" and request sex from her, but that those individuals are not arrested. Gallegos argues that this testimony suggests that he would not have been arrested had he not driven to Union Middle School,[2] and, therefore, something more than "cybersex" with a minor is required. Because the "something more" is not defined in the enticement statute, Gallegos argues that law enforcement can arbitrarily enforce the law. We disagree.

¶ 21 We conclude that the enticement statute is specific enough to prevent arbitrary enforcement because the discretion to prosecute individuals under the statute is properly limited to those who "solicit, seduce, lure, or entice" a known minor[3] to engage in unlawful sexual activity. Whether and whom to arrest is ultimately a problem of resource allocation and the difficulty associated with proving the intent element of the crime. That is, law enforcement may more aggressively pursue those individuals who actually arrange a meeting because in those cases it is easier to prove the individual's intent to engage in the proscribed conduct. Accord-

---

1. Moreover, any concern about lack of notice is "ameliorated by the fact that [the enticement statute] contains a scienter requirement," i.e., that the person must "knowingly" solicit a minor. *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

2. Eldredge testified at the preliminary hearing as follows:

    Q: [H]ave you ever set up a meeting with somebody, they have not shown up, and then you've gone to arrest them?
    A: Not unless they came and then got away.

Q: The actual meetings [sic] pretty important, correct?
A: Yes.
Q: And going to the meeting is pretty important?
A: Yes.

3. Gallegos also argues that he did not know he was speaking to a thirteen-year-old girl, but instead thought he was actually talking to a homosexual male. Whether this is true is a credibility question for the jury to decide based on the testimony and evidence presented.

ingly, variation in enforcement of the entice-ment statute may occur because it is simply easier to prosecute those individuals who ac-tually arrange a meeting, not because the statute itself is impermissibly vague.

¶ 22 In sum, we conclude that the entice-ment statute is not unconstitutionally vague because it affords the average person reason-able notice of what conduct is proscribed and is specific enough to avoid arbitrary and discriminatory enforcement. Moreover, be-cause Gallegos engaged in conduct that was clearly proscribed by the statute, he "cannot complain of the vagueness of the law as applied to the conduct of others." *Ansari,* 2004 UT App 326, ¶ 44, 100 P.3d 231 (internal quotation marks omitted). Accordingly, both his facial and as-applied challenges fail.

## II. VOLUNTARY TERMINATION INSTRUCTION

¶ 23 Utah Code section 76–2–307 provides for an affirmative defense of volun-tary termination. Specifically, section 76–2–307 states, in part:

> It is an affirmative defense to a prosecu-tion . . . that prior to the commission of the offense, the actor voluntarily terminated his effort . . . and either:
>
> (1) gave timely warning to . . . law en-forcement . . . or the intended victim; or
>
> (2) wholly deprives his prior efforts of effectiveness in the commission.

Utah Code Ann. § 76–2–307 (2003). "A de-fendant is entitled to a [voluntary termi-nation] instruction . . . if there is a reason-able basis in the evidence to justify giving the requested instruction." *State v. Dumas,* 721 P.2d 502, 506 (Utah 1986). We have already concluded that the crime is complete when an individual solicits a minor via the internet to engage in unlawful sexual activity. In this case, there is simply no evidence to suggest that Gallegos voluntarily terminated the online conversation prior to the commis-sion of the crime, and it is irrelevant that he drove away from Union Middle School be-cause no additional step beyond solicitation is

required by the enticement statute. Accord-ingly, the voluntary termination instruction is inapplicable, and the trial court correctly de-nied Gallegos' request to present it to the jury.

## III. MOTION TO SUPPRESS

¶ 24 Gallegos next argues that the trial court erred in denying his motion to suppress certain incriminating statements he made to Eldredge prior to his arrest. Specifically, Gallegos contends that he was subjected to custodial interrogation and, therefore, El-dredge violated his *Miranda* rights when she questioned him regarding the location of his computer. Moreover, Gallegos argues that admitting the statements at trial was not harmless error because the jury would not have reached the same verdict without the incriminating statements. Again, we dis-agree.

¶ 25 The Fifth Amendment to the United States Constitution guarantees that a person shall not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

> We protect this right by excluding from a defendant's criminal trial any incrimina-ting statement that the defendant made to police officers while under custodial inter-rogation if the officers did not give a *Mi-randa* warning. . . . [C]ustodial interroga-tion occurs where there is both (1) custody . . . and (2) interrogation. These two ele-ments are interrelated.

*State v. Levin,* 2006 UT 50, ¶¶ 33–34, 144 P.3d 1096 (footnote omitted). Each element is discussed individually below.

### A. Custody [4]

¶ 26 Custody occurs when an in-dividual's "freedom of action is curtailed to a degree associated with formal arrest." *Id.* ¶ 35 (internal quotation marks omitted). The inquiry is objective, and "[a] suspect may understand himself . . . to be in custody based either on physical evidence or on the nature of the officer's instructions and ques-tions." *Id.* In *Salt Lake City v. Carner,* this

---

4. The trial court did not analyze whether Galle-gos was in "custody." Instead, it limited its

analysis to whether interrogation occurred.

court set out a four-factor test to determine whether a defendant is in custody for the purpose of *Miranda* protections: "(1) the site of the interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; (4) the length and form of interrogation." 664 P.2d 1168, 1171 (Utah 1983).

¶ 27 We conclude that Gallegos was, in fact, in custody at the time he made the statements to Eldredge. As to the site of the interrogation, it is true that Gallegos requested to meet officers at the clubhouse of his apartment building and that he went there voluntarily. At first blush, this suggests a public environment, which weighs against a finding of custody. *See Levin*, 2006 UT 50, ¶ 39, 144 P.3d 1096 ("Places that are confined or isolated are more likely to indicate custody than those that are public and open."). However, when police officers pulled their cars directly behind him with the flashing lights on, the location transformed from one of a public and open nature to one of confinement. Moreover, while the apartment clubhouse may be a public place during the day, at four o'clock in the morning it takes on an isolated character.

¶ 28 The second factor, the focus of the investigation, clearly weighs in favor of a finding of custody. Gallegos had spoken to his wife, who informed him that police in SWAT gear had been at the apartment looking for him. Gallegos was, therefore, clearly aware that the investigation focused on him.

¶ 29 The third factor, the presence of indicia of arrest, also weighs in favor of a finding of custody. While no guns were drawn, Gallegos was surrounded by "six to seven" officers, some of whom wore police vests, while others wore badges. His car was surrounded by police cars with their lights on, and he was frisked and asked to remove the contents of his pockets, including his car keys. Moreover, while not physically restrained, the placement of the police cars and the removal of his car keys made any movement practically impossible.

¶ 30 Finally, as to the length of the interrogation, this factor weighs against a finding of custody. Eldredge only asked a few questions about the whereabouts of his computer, and then quickly placed Gallegos under arrest. On balance, we conclude that Gallegos was in custody for the purposes of *Miranda* protections because a reasonable person in his position would not have felt free to leave.

### B. Interrogation

¶ 31 After the custody determination is made, we must next decide "whether the incriminating statement was the product of interrogation." *Id.* ¶ 37. "Interrogation is 'either express questioning or its functional equivalent' and it incorporates any 'words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.'" *State v. Low*, 2008 UT 58, ¶ 70, 192 P.3d 867 (quoting *Levin*, 2006 UT 50, ¶ 37, 144 P.3d 1096 (emphasis omitted)).

¶ 32 We conclude that Gallegos was interrogated for the purposes of *Miranda*. Eldredge initiated direct questioning about the key piece of evidence the police would eventually need—Gallegos' computer. Her statements were not questions normally attendant to arrest and custody, nor were they simply agreements with Gallegos' voluntary statements. *See State v. Dutchie*, 969 P.2d 422, 426 (Utah 1998); *State v. Yoder*, 935 P.2d 534, 545–46 (Utah Ct.App.1997). Instead, Eldredge should have known that questioning Gallegos about the whereabouts of the computer would likely elicit an incriminating response from him. We therefore conclude that Gallegos was also interrogated for the purpose of *Miranda* analysis. Accordingly, the trial court erred in admitting the statements about the computer at trial.

### C. Harmless Error

¶ 33 Although the trial court erred in admitting the incriminating statements at trial, we conclude that the error was harmless. In this case, there was an abundance of other evidence presented to the jury suggesting Gallegos' guilt. Most importantly, the jury had a transcript of the sexually graphic online conversation between Gallegos and Chantel. The jury also heard evidence that Gallegos arranged to meet with Chantel and

actually drove to the proposed meeting place. Moreover, the jury heard evidence that Gallegos called Eldredge and told her he was scared and asked if he was going to be arrested. In light of this overwhelming evidence of Gallegos' guilt, we conclude that any error in admitting the statement was harmless beyond a reasonable doubt.[5]

## IV. MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY

¶ 34 Gallegos argues that the trial court erred in excluding the testimony of Dr. Peter Byrne, who should have been permitted to testify that "based upon the psychosexual testing he administered, it was his expert opinion that [the defendant] was not a 'pedophile' and not attracted to children." Moreover, Gallegos contends that Dr. Byrne's testimony was relevant under rule 401 of the Utah Rules of Evidence to establish a pertinent character trait, that is, that Gallegos was not a pedophile. The State, on the other hand, argues that whether Gallegos is a pedophile is simply not proper character evidence as contemplated by rule 404(a)(1). More importantly, because the penile plethysmograph (PPG) that formed the basis of Dr. Byrne's testimony was "invalid," the State contends that the test is also irrelevant under rule 401.[6]

¶ 35 Under the Utah Rules of Evidence, expert testimony is admissible if "specialized knowledge will assist the trier of fact ... to determine a fact in issue." Utah R. Evid. 702. By attempting to introduce Dr. Byrne as an expert witness in this case, Gallegos sought to demonstrate to the jury that he was not a pedophile, but was instead sexually attracted to age-appropriate females. Specifically, Gallegos sought to introduce the results of a PPG administered by Dr. Byrne as "character evidence" of his purported non-pedophilia under rule 404(a)(1).

¶ 36 Rule 404(a)(1) states that the accused may introduce "pertinent" character trait evidence. Pertinent has been held to mean "relevant." *Cf. United States v. Staggs*, 553 F.2d 1073, 1075 (7th Cir.1977). *See also* Utah R. Evid. 404(a)(1).

¶ 37 This court held in *State v. Miller*, 709 P.2d 350 (Utah 1985), that psychological expert testimony regarding sexual offenders who abuse children is relevant evidence:

> Rule 404(a), Utah R. Evid., specifically permits an accused to offer "evidence of a pertinent trait of his character," for the purpose of "proving that he acted in conformity therewith on a particular occasion." The [expert] testimony ..., in conjunction with the proffered testimony from the appellant, would have been relevant to a pertinent trait of his character, namely, the incongruity of his personality traits with those of individuals capable of and likely to commit sexual offenses against children.

*Id.* at 353.

¶ 38 Under the *Miller* rule, we hold that the trial court erred in determining that the proffered expert testimony was irrelevant. Nevertheless, we further hold that the error was harmless. As discussed in detail above, the evidence that all the elements of enticement were in fact committed was virtually uncontroverted. Evidence of the defendant's lack of sexual interest in children would not likely have addressed any of the actual acts he undertook, which were entirely sufficient to sustain the conviction notwithstanding his intent in undertaking them.

## V. CUMULATIVE ERROR

¶ 39 Gallegos' cumulative error argument is without merit.

A reviewing court will reverse a jury verdict under the cumulative error doctrine

---

5. This conclusion is bolstered by the fact that the computer statement evidence was used minimally at trial. In over 300 pages of trial transcripts, references to the statements Gallegos made about his computer—including closing argument—comprise roughly one page total. The majority of the State's case focused on the content of the transcript, as well as other evidence suggesting that Gallegos believed Chantel was thirteen years old.

6. The PPG report states, "Taking all of the validity observations into account, it appears that this administration of the [PPG] is an invalid representation of [Gallegos'] sexual arousal pattern."

only if the cumulative effect of the several errors undermines ... confidence that a fair trial was had. If, however, we determine that a defendant's claims do not constitute errors on the part of the trial court, then it follows that the requirements of the cumulative error doctrine are not met.

*State v. Killpack,* 2008 UT 49, ¶ 56, 191 P.3d 17 (omission in original) (internal quotation marks omitted). We have held that two of the errors alleged by Gallegos do not constitute error. The nature of the two remaining errors is insufficient to reach the cumulative error standard; they do not undermine confidence that Gallegos received a fair trial. Accordingly, this claim also fails.

## CONCLUSION

■ ¶ 40 We conclude that the enticement statute is not unconstitutionally vague because it affords the average person reasonable notice of what conduct is proscribed and is specific enough to avoid arbitrary and discriminatory enforcement. Accordingly, Gallegos' facial and as-applied challenges fail. Additionally, because the statute requires no additional step beyond solicitation, that is no meeting is necessary, we also conclude that the trial court correctly denied the voluntary termination instruction. Furthermore, although Gallegos was subjected to custodial interrogation and thus *Miranda* rights attached to the statements he made about his computer, admission of those statements at trial was harmless error because there was ample additional evidence of Gallegos' guilt. Finally, while the trial court erroneously ruled that proposed expert testimony as to Gallegos' non-pedophile character was irrelevant, that error was likewise harmless. Thus, because two of the alleged errors were not in fact errors and because the remaining two errors do not rise to the level of cumulative error, Gallegos' cumulative error challenge also fails. Affirmed.

¶ 41 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Judge BENCH concur in Justice WILKINS' opinion.

¶ 42 Justice NEHRING does not participate herein; Utah Court of Appeals Judge RUSSELL W. BENCH sat.