2011 UT App 317

**STATE of Utah, Plaintiff and Appellee,**

v.

**Darren BERRIEL, Defendant and Appellant.**

No. 20090665–CA.

Court of Appeals of Utah.

Sept. 15, 2011.

Margaret P. Lindsay and Douglas J. Thompson, Provo, for Appellant.

Mark L. Shurtleff and Kenneth A. Bronston, Salt Lake City, for Appellee.

Before Judges DAVIS, THORNE, and ROTH.

## MEMORANDUM DECISION

ROTH, Judge:

¶ 1 Darren Berriel appeals his convictions for aggravated assault, a third degree felony, *see* Utah Code Ann. § 76–5–103(1)(b), (3) (2008) (current version at *id.* § 76–5–103(1)(a), (2)(a) (Supp.2011)), and possession of a deadly weapon with intent to assault, a class A misdemeanor, *see id.* § 76–10–507 (2008). First, he argues that the trial court erred in refusing to instruct the jury on justification for the use of force in defense of another as a defense to the aggravated assault charge. Second, he contends that the trial court erroneously denied his motion to merge the weapon possession conviction with the aggravated assault conviction. We affirm the trial court's decision to deny the requested instruction but vacate the conviction for possession of a deadly weapon with intent to assault.

¶ 2 Berriel was charged with stabbing the victim, Luis, with a knife and with possession of the knife with the intent to commit the assault. Approximately three weeks before the incident from which these charges arose, Berriel's friend, Rachel, confided in him that Luis, her boyfriend, was physically abusing her.[1] When Rachel called Berriel on September 23, 2008, for help, she was screaming and crying that Luis was beating her. Ber-

---

1. Rachel testified that she had told Berriel that Luis hits her. Others testified that they had witnessed other acts of abuse, including Luis pushing Rachel into a car door, causing her to hit her head and leaving a scar on it, and throwing her across a room. It is not apparent from the record that Berriel was aware of these acts.

riel, who had been driving a group of friends to the movies, immediately drove to Rachel and Luis's house. On the way, he called one of Rachel's friends to have her remove Rachel from the scene. When Berriel arrived, however, neither Luis nor Rachel were home. Berriel and his friends waited in the car for them to return.

¶ 3 In the meantime, Luis and Rachel had gone to pick up Rachel's younger brother. Rachel testified that the entire trip took fifteen to twenty minutes.[2] When they returned to the house, Luis was driving, while Rachel was in the passenger seat and her brother was in the back seat. As the three exited the car, there was no indication of an ongoing argument, nor did any of them appear to be upset. Berriel immediately ran at Luis with a knife.[3] As Berriel approached, Luis told him, "[Y]ou don't need that knife to fight with me." A brief physical encounter ensued, during which Berriel thrust his knife toward Luis's stomach. Luis dropped his arms to protect his abdomen, and the knife caught him in the left forearm. Luis then ran to get his dog from the backyard, and Berriel and his friends fled. Although Luis pursued Berriel and his friends by car, he never caught up with them. Luis later went to the hospital to have his arm stitched. During the encounter, Rachel was somewhere between fifteen feet and fifteen yards away from the altercation.[4]

¶ 4 Berriel's first claim of error is that the trial court refused to instruct the jury on his defense that the attack on Luis was justified by the need to defend another person, Rachel. *See* Utah Code Ann. § 76–2–402(1) (2008) ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that force is necessary to defend himself or a third person against such other's imminent use of unlawful force.") (current version at *id.* § 76–2–402(1)(a) (Supp.2011)). We review the trial court's denial of a requested jury instruction as a question of law for correctness. *See State v. Gallegos*, 2009 UT 42, ¶ 10, 220 P.3d 136. In an analogous situation, the Utah Supreme Court addressed the circumstances that entitle a defendant to a jury instruction on self-defense, which is codified, along with defense of another, in Utah Code section 76–2–402(1) as a justification defense:

> "If the defendant's evidence, although in material conflict with the State's proof, be such that the jury may entertain a reasonable doubt as to whether or not he acted in self-defense, he is entitled to have the jury instructed fully and clearly on the law of self-defense. Conversely, if all reasonable men must conclude that the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether a defendant accused of a crime acted in self-defense, tendered instructions thereon are properly refused."

*State v. Maestas*, 564 P.2d 1386, 1390 (Utah 1977) (quoting *State v. Castillo*, 23 Utah 2d 70, 457 P.2d 618, 620 (1969)); *see also State v. Garcia*, 2001 UT App 19, ¶ 8, 18 P.3d 1123 (observing that it is the defendant's burden to "provide some reasonable basis for the jury to conclude" that the action was justified, though the evidence may be presented

---

**2.** Luis testified that the only phone available to Rachel was their home phone. We therefore can infer that at least fifteen minutes passed between the phone call and the altercation. We have no information, however, as to precisely how much time had passed.

**3.** There was testimony from one witness that Berriel had begun to run toward Luis's car even before it stopped. Another witness, however, indicated that it was Luis who actually ran at Berriel. Because of this testimony, the trial court granted Berriel's request to instruct the jury on self-defense. Except where this conflict is relevant to the resolution of an issue on appeal, we accept the facts in favor of the jury's verdict. *See generally State v. Jeffs*, 2010 UT 49,

¶ 3, 243 P.3d 1250 ("On appeal, we review the record facts in a light most favorable to the jury's verdict." (internal quotation marks omitted)).

**4.** Rachel testified that she was near a light post away from the altercation, though she did not give a distance. Luis estimated that the light post was fifteen to twenty feet from him and Berriel. Rachel's friend corroborated that Rachel was not near the encounter. Rachel's brother testified that he too was near the light post, which he estimated was fifteen yards from Luis and Berriel. He later clarified that he was no more than the distance between the witness stand and the podium in the courtroom, a distance not specified in the record.

by either the prosecution or the defense (emphasis omitted)).

¶ 5 The trial court decided there was a sufficient basis for a self-defense instruction in this case because one witness testified that Luis first ran at Berriel. Unlike the self-defense claim, however, there is no evidence capable of creating a reasonable doubt that Berriel may have been acting in defense of Rachel.[5] According to the undisputed testimony, when Rachel and Luis arrived at their residence, at least fifteen minutes after Rachel had called Berriel and told him that Luis was assaulting her, they did not appear even to be arguing. There was no evidence that Luis, during the time he could have been observed by Berriel, had threatened, touched, harmed, or even approached Rachel in any way, nor had he exhibited any weapons. In fact, from the point at which he emerged from the car, Luis's attention was directed entirely at Berriel, who was coming at him with a knife.[6] Moreover, during Luis's encounter with Berriel, Rachel was at least fifteen feet away and out of the path of the confrontation. On these facts, a jury could not reasonably have concluded that Luis posed a present or imminent threat of unlawful force to Rachel. *See generally Harris v. Scully*, 779 F.2d 875, 879 (2d Cir. 1985) (affirming the denial of an instruction on defense of a third person in a murder trial because there was no version of the events in which the jury could have believed that the deceased was about to use deadly force against the defendant's mother or brother when the deceased had just left the home where the mother was located and the brother had broken free from the fistfight); *State v. Hernandez*, 253 Kan. 705, 861 P.2d 814, 820 (1993) (upholding the trial court's decision to deny an instruction on defense of another where the person allegedly defended was not present during the fight that led to the fatal gunshots because implied threats

and a "history of violence [between the deceased and the third person] could not turn the killing into a situation of imminent danger"); *State v. Brown*, 607 P.2d 261, 266 (Utah 1980) (affirming the denial of justification instructions where the only evidence to support the defendant's theory of self-defense was that the deceased had implicitly threatened him with a club while the defendant was still inside the house and the deceased remained outside). The fact that Berriel may have believed that Rachel was in danger when she called because she was screaming and crying for help and Berriel was aware that Luis had previously physically abused her likewise does not constitute a sufficient basis for a defense-of-another instruction where at least fifteen minutes had passed from the time of her call and there was no evidence that Rachel was in imminent danger at the time Berriel attacked Luis. *See State v. Starks*, 627 P.2d 88, 91 (Utah 1981) (stating that "[t]he right to [justification defenses] ceases when the danger has passed or ceases to be imminent").

¶ 6 Thus, while there was some evidence that Berriel had information that led him to believe Luis had been violent toward Rachel in the past, even the very recent past, under the circumstances at the time he assaulted Luis with a knife, a jury could not reasonably have concluded that the nature or immediacy of the danger to Rachel reasonably justified a belief that it was probable that Luis was about to use "unlawful force" against her. And it is the imminence of harm to another that is central to the legal justification of violence to prevent it; otherwise, this humane law of justification could be extended to countenance retribution or vigilantism. *See generally* Utah Code Ann. § 76–2–402. Therefore, we affirm the trial court's decision not to instruct the jury on defense of another as a justification for Berriel's conduct.

---

5. Some of the factors that are relevant to whether the threat of unlawful force is imminent and whether the defendant's actions are reasonable are "the nature of the danger," "the immediacy of the danger," "the probability that the unlawful force would result in death or serious bodily injury," "the other's prior violent acts or violent propensities," and "the patterns of abuse or violence in the parties' relationship." Utah Code

Ann. § 76–2–402(5) (2008) (current version at *id.* (Supp.2011)).

6. While there was a conflict in the evidence as to whether Luis or Berriel was the *first* to run toward the other, there was no dispute that Berriel ran toward Luis with a knife in his hand.

¶ 7 We turn now to Berriel's contention that the possession of a deadly weapon with intent to assault conviction should have merged[7] with the aggravated assault conviction.[8] Pursuant to Utah Code section 76-1-402,

> [a] defendant may be prosecuted in a single criminal action for all separate offenses arising out of a single criminal episode; however, when the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision; an acquittal or conviction and sentence under any such provision bars a prosecution under any other such provision.

Utah Code Ann. § 76-1-402(1) (2008). Specifically, "[a] defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense." *Id.* § 76-1-402(3). We review whether a crime is a lesser included offense of another as a question of law for correctness. *See State v. Chukes*, 2003 UT App 155, ¶ 9, 71 P.3d 624.

¶ 8 To determine whether one offense is included within another, we apply a two-phase test. *See State v. Ross*, 951 P.2d 236, 241 (Utah Ct.App.1997) (citing *State v. Hill*, 674 P.2d 96, 97 (Utah 1983)). First, we compare the statutory elements to determine if the lesser offense is proven by the same or less than all the elements required to prove the greater offense, that is, whether the crimes are "such that the greater cannot be committed without necessarily having committed the lesser." *See id.* (internal quotation marks omitted). If either of the crimes have multiple variations, as in this case, we must also "consider the evidence to determine whether the greater-lesser relationship exists between the specific variations of the crimes actually proved at trial." *See id.* (internal quotation marks omitted).

¶ 9 Two of our prior cases provide useful guidance in applying this test. In *State v. Ross*, 951 P.2d 236 (Utah Ct.App.1997), the defendant was involved in a forged check cashing scheme, in which he and a male accomplice would pick up a female accomplice to whom they would provide false identification and a forged check. *See id.* at 237-38. The woman would then cash the check while the men waited in the car; she then returned the cash to the male accomplice, who divided it between them. *See id.* During the three-week scheme, they cashed, in this manner, thirty-five to forty checks, each worth $300 to $700. *See id.* The defendant was convicted of forgery and communications fraud, and he appealed, arguing that the forgery offense was included within communications fraud. *See id.* at 237-38, 241 & n. 6. To be guilty of communications fraud, one must "devise[ ] any scheme or artifice to defraud another" of "property, money, or [other] thing" worth at least $5000 and must "communicate[ ] directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice." *See id.* at 241-42 (internal quotation marks omitted). Forgery requires a person to "make[ ], complete[ ], execute[ ], authenticate[ ], issue[ ], transfer[ ], publish[ ], or utter[ ]" a "check with a face amount of $100 or more" with the "purpose to defraud" or "knowledge that he is facilitating a fraud." *See id.* at 242 (internal quotation marks omitted).

¶ 10 After comparing the elements, we determined that under at least one variation of the offenses, forgery was a lesser included offense of communications fraud. *See id.*

---

7. Although Berriel refers to this claim as a merger issue, he frames the issue as one that involves both the merger and the lesser included offense doctrines. We agree that, under the facts presented to the jury in this case, possession of a deadly weapon with intent to assault is a lesser included offense of aggravated assault and do not address whether the merger doctrine, as described in a series of kidnaping cases cited by Berriel, provides a separate basis for reversing the conviction.

8. The State argues that this issue is not preserved because Berriel raised it following the State's case-in-chief and did not renew it after the jury rendered its verdict. According to our case law, however, a merger or lesser included offense argument is preserved if it is raised "at any time, either during trial, or following the conviction on a motion to vacate." *State v. Lopez*, 2004 UT App 410, ¶ 7, 103 P.3d 153 (internal quotation marks omitted).

Under that variation, a defendant would have to have devised a scheme that involved uttering or transferring forged checks of at least $100 and "communicated with another person for the purpose of executing the [fraudulent] scheme by uttering or transferring a forged check worth at least $100" with the goal of obtaining at least $5000 total. *See id.* We thus considered whether, under the specific variations of the crimes presented and proven at trial, forgery was an included offense. *See id.* The State conceded that it had told the jury that it could find that both a "communication" required for communications fraud and an "utterance" required for forgery occurred when the defendant passed the check to the female accomplice. *See id.* It argued on appeal, however, that the conviction could be upheld because there was evidence in the record from which the jury could have found an independent basis for the communications fraud conviction. *See id.* We disagreed, observing that the jury instructions perpetuated the State's theory that the "communication" and the "utterance" could both be the passing of the written check because they defined "communication" as including a writing such as a check. *See id.* at 245. Moreover, the jury was never asked to find a "communication" separate from the passing of the check. *See id.* Without a separate factual basis for each conviction, we determined that forgery was a lesser included offense of communications fraud and vacated the forgery conviction. *See id.*

¶ 11 A similar issue arose in *State v. Chukes*, 2003 UT App 155, 71 P.3d 624, in which this court considered whether forgery was a lesser included offense of identity fraud. *See id.* ¶ 16. We agreed with the parties that some variations of identity fraud included forgery because the forgery elements of "mak[ing] or execut[ing] a writing purporting to be an existent person" "with a purpose to defraud" could fall within the scope of the "us[ing] or attempt[ing] to use [personal] information with fraudulent intent" elements of identity fraud. *See id.* ¶¶ 16–18 (internal quotation marks omitted).

Thus, we examined the evidence presented at trial to determine if the convictions of each offense were based on separate factual evidence. *See id.* ¶ 19. At trial, the State did not argue to the jury that the identity fraud was accomplished by acts different from those necessary to commit forgery. *See id.* ¶ 23. Nor did the jury instructions explicitly inform the jury that the forged writings themselves could not also fulfill the "us[ing] or attempt[ing] to use [personal] information" element of identity fraud. *See id.* ¶¶ 16, 26. Thus, having determined that the "the [arguments,] instructions[,] and evidence at trial" did not inform a reasonable jury that it had to base each conviction on separate evidence, we vacated the defendant's conviction for forgery as a lesser included offense of identity fraud. *See id.* ¶¶ 22–23, 27 (alterations in original) (internal quotation marks omitted).

¶ 12 Using the approach employed in *Ross* and *Chukes*, we now consider whether Berriel was appropriately convicted of both aggravated assault and possession of a deadly weapon with an intent to assault. A defendant is guilty of one variation of third degree aggravated assault if he commits an assault by using a dangerous weapon. *See* Utah Code Ann. § 76–5–103(1)(b), (3) (2008) (current version at *id.* § 76–5–103(1)(a), (2)(a) (Supp.2011)). A "[d]angerous weapon" includes "any item capable of causing death or serious bodily injury," a definition that clearly includes most knives. *See id.* § 76–1–601(5)(a) (2008). The defendant must commit such acts intentionally, knowingly, or recklessly. *See id.* § 76–5–103 (specifying no culpable mental state for aggravated assault); *id.* § 76–2–102 (providing the culpable mental state for crimes where the definition of the offense does not specify one). A defendant is guilty of possession of a deadly weapon with intent to assault, a class A misdemeanor, if he possesses a dangerous weapon[9] with the accompanying "intent to unlawfully assault another." *See id.* § 76–10–507. A comparison of the elements of the two crimes reveals that the *possession* of a dead-

---

9. While section 76–10–507 describes the weapon as "deadly" in its title, the wording of the statute itself requires only that the weapon be "danger- ous." *See generally* Utah Code Ann. § 76–10–507 (2008). This nominal inconsistency is not an issue on appeal.

ly weapon—the knife—which is an element of the weapon possession charge, can be proven by the same facts as the *use* of the dangerous weapon required by the aggravated assault charge because a defendant ordinarily has to possess the weapon to use it. Additionally, the "intent to unlawfully assault another" element of the weapon possession charge can be established by the same facts as the aggravated assault charge if the assault itself was intentional. Thus, we must "consider the evidence to determine whether the greater-lesser relationship exists between the specific variations of the crimes actually proved at trial." *See Ross*, 951 P.2d at 242 (internal quotation marks omitted).

¶ 13 Although aggravated assault involving the use of a dangerous weapon may be committed intentionally, knowingly, or recklessly, *see* Utah Code Ann. § 76–5–103(1)(b); *id.* § 76–2–102, the State focused its case at trial on evidence that Berriel both intended to assault Luis and intentionally did so. In particular, the State called a friend of Rachel's, who testified that Berriel had called her prior to the encounter and instructed her to get Rachel away from the house. Three of Berriel's friends also testified for the State. Their testimonies presented a picture for the jury of the events leading up to the assault: that Berriel received a call from Rachel, in which she was screaming and crying for Berriel's help and his protection from Luis; that Berriel had indicated to at least one friend that he needed to go to Rachel's house because Luis was beating her; that he immediately turned the car around and drove to Rachel's house; and that Berriel was quiet during the drive, as though he was "thinking through" his response to Rachel's request. When they arrived at Rachel and Luis's house, no one was home. As soon as Luis arrived though, which was at least fifteen minutes after Rachel's call, Berriel ran at Luis with a knife. The encounter lasted only a few moments during which Berriel stabbed Luis and then fled. In the car after the assault, Berriel admitted stabbing Luis with the knife. There was no testimony that suggested that the stabbing was an accident or was recklessly inflicted. Further, the instruction the jury received regarding culpable mental state discussed only intent:

In every crime or public offense there must be a union or joint operation of the act and the defendant's mental state to commit the act. The defendant's mental state is manifested by the circumstances connected with the offense and his sound mind and discretion.

*In this case, the defendant must have acted "intentionally" or "with intent."* Under the law of the State of Utah, a person engages in conduct intentionally, or with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result.

(Emphasis added.) Thus, under the facts of this case, the weapon possession conviction is a lesser included offense of the aggravated assault conviction unless the jury could have found that Berriel possessed the knife with intent to assault from evidence separate and apart from the facts of the assault itself.

¶ 14 The State asserts that there is such an independent basis for the weapon possession conviction. "In essence, the State [is] argu[ing] that the evidence establishes that the [possession] and [aggravated assault] convictions were separate acts," based on separate facts sufficient to support each conviction. *See Chukes*, 2003 UT App 155, ¶ 20, 71 P.3d 624; *id.* ¶ 21 (stating that multiple acts may be charged as separate offenses if one could be committed without necessarily committing the other or they are separated by time and space sufficient to create an independent ground for a conviction on each offense); *see also State v. Roth*, 2001 UT 103, ¶ 8, 37 P.3d 1099 (upholding separate convictions for possession of methamphetamine and possession of equipment or supplies with intent to engage in a clandestine laboratory operation where the special verdict form indicated that the clandestine laboratory conviction was based on possession of manufacturing equipment rather than the methamphetamine that formed the basis of the possession conviction).

¶ 15 The record evidence, however, does not support a conclusion that the convictions were based on separate conduct. For exam-

ple, there is nothing in the record that shows that Berriel was in possession of the knife with intent to assault prior to the assault itself. Rather, the witnesses first place Berriel in possession of a knife as he is running toward Luis, that is, in the course of actually assaulting him. Indeed, the State itself, in its closing statement, told the jurors that they might not be able to determine precisely when Berriel formed his intent to assault Luis, thus conceding by implication that the same limitation applied to his *possession* of the knife with the requisite intent:

> Now whether that was intent on the drive over or whether or not he *formulated that intent in the moment* is unclear but he manifested his intent to fight.... It is not [the State's] burden to show that [Berriel] had the intent to assault on his drive over. All we have to show is that *at some point during this altercation* he did have the intent to do what he did....

(Emphases added.) Although the jury may have been able to draw an inference that Berriel arrived with the knife based on the fact that he came in his own car and the absence of any testimony that Berriel obtained the knife upon arriving, such an inference does not constitute independent evidence sufficient to uphold separate convictions because it is necessarily derived from the direct evidence of the assault itself, i.e., Berriel's possession of the weapon as he charged at Luis.[10] *See generally United States v. Gore*, 154 F.3d 34, 43–47 (2d Cir.1998) (applying the "independent evidence" doctrine adopted by other circuits to require evidence that the defendant actually possessed drugs in addition to the amount he sold to be convicted of both possession of a controlled substance

and distribution of a controlled substance).[11]

¶ 16 Moreover, the jury was not specifically instructed that its convictions for each offense had to be based on separate evidence. Our precedent is clear that not only must separate convictions for offenses arising out of the same criminal episode be based on different facts but that the jury must be so instructed. *See generally State v. Chukes*, 2003 UT App 155, ¶¶ 23, 26–27, 71 P.3d 624 (vacating the defendant's conviction for forgery where "the [arguments,] instructions[,] and evidence at trial" did not inform the jury that "it had to find an additional element beyond the elements of [identity fraud] before it could convict defendant of forgery," that is, the convictions could not be based on the same forged writings (alterations in original) (internal quotation marks omitted)); *State v. Ross*, 951 P.2d 236, 242 (Utah Ct. App.1997) (concluding that the forgery offense was included within the communications fraud conviction where the jury was not "'required to find'" that the communications fraud was based on separate acts (quoting *State v. Bradley*, 752 P.2d 874, 878 (Utah 1988) (per curiam))). *Cf. Roth*, 2001 UT 103, ¶ 8, 37 P.3d 1099 (upholding separate convictions where the jury filled out a special verdict form that indicated that the clandestine laboratory conviction was based on the defendant's possession of equipment rather than on the possession of the methamphetamine that formed the basis of the possession conviction). Nothing in the jury instructions informed the jury that the possession conviction could not be based simply on Berriel's possession of the knife during the assault, nor did the evidence or assertions of counsel clarify the matter. Thus, because "the [ar-

---

**10.** As the State conceded at oral argument, defense counsel's remarks in opening statement and closing argument that Berriel was in possession of the knife when he went to the house were not evidence. The trial court properly instructed the jury not to consider the attorney's statements as fact.

**11.** Even if there were evidence that Berriel possessed the knife for some significant period of time prior to the assault, the lesser included offense limitation may still have precluded separate convictions. An offense is included within another if "[i]t constitutes an attempt, solicita-

tion, conspiracy, or *form of preparation* to commit the offense charged." Utah Code Ann. § 76–1–402(3)(b) (2008) (emphasis added). Because Berriel has not asserted that the possession of the knife was a "form of preparation" to commit the aggravated assault and because the facts upon which the convictions were based are so narrow, we need not consider whether Berriel's acts prior to committing the assault were a "form of preparation" and reserve this issue for another day when a showing of an independent factual basis has been made.

guments,] instructions[,] and evidence at trial" did not clearly inform the jury that it had to find a separate factual basis for the possession of a deadly weapon with intent to assault conviction beyond the possession necessary to commit the aggravated assault, his conviction for possession of the knife with intent to assault is not independently sustainable. *See Chukes*, 2003 UT App 155, ¶ 23, 71 P.3d 624 (alterations in original) (internal quotation marks omitted). We therefore vacate Berriel's conviction for possession of a deadly weapon with an intent to assault.

¶ 17 Affirmed in part and reversed in part.

¶ 18 I CONCUR: JAMES Z. DAVIS, Presiding Judge.

THORNE, Judge (concurring and dissenting):

¶ 19 I dissent from the majority opinion as to its defense-of-others analysis but concur as to the remainder. I agree with the majority opinion that, under the circumstances of this case, Berriel's conviction for possession of a deadly weapon with intent to assault must be vacated as a lesser included offense of his aggravated assault conviction. However, I disagree with the majority's conclusion that Berriel was not entitled to a jury instruction on defense of others. I would reverse both of his convictions on that basis in addition to vacating the weapons charge on the grounds cited by the majority.

¶ 20 Pursuant to Utah Code section 76–2–402, "[a] person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force ... is necessary to defend ... a third person against another person's imminent use of unlawful force." Utah Code Ann. § 76–2–402(1) (Supp.2011). The statute expressly assigns the questions of imminence and reasonableness to the "trier of fact" and provides a nonexclusive list of factors to be considered in making that determination. *See id.* § 76–2–402(5).[1] Although a defendant's entitlement to a defense-of-others instruction is "conditioned upon the existence of a reasonable basis in the evidence to justify the giving of the proposed instruction," *State v. Eagle*, 611 P.2d 1211, 1213 (Utah 1980), a requested instruction should be given "if there is *any* reasonable basis in the evidence to justify it," *State v. Torres*, 619 P.2d 694, 695 (Utah 1980) (emphasis added). *See also State v. Garcia*, 2001 UT App 19, ¶¶ 8–9, 18 P.3d 1123 (discussing self-defense instructions).

¶ 21 Multiple witnesses testified about a phone call from Rachel to Berriel shortly before the stabbing, informing Berriel that Luis was beating Rachel. One of Berriel's companions testified that Rachel's call prompted the group to go to her house to help her because Luis had been hitting her. Another testified that Rachel was crying because Luis was hitting her. And a third, Scott Carlisle, testified that Rachel was screaming and crying on the phone, that he thought Rachel was being beaten because it had happened before, and that after the phone call Berriel indicated that the group should go to Rachel's house because she was being beaten up.

¶ 22 A reasonable jury could easily conclude from this testimony that, at the time Berriel spoke with Rachel on the phone, she was in imminent danger and the use of reasonable force in her defense at that moment would have been justified under the statute. The question before us is whether Berriel continued to have a reasonable belief that she *remained* in imminent danger a short time later,[2] when Luis and Rachel arrived

---

1. These factors include the nature and immediacy of the danger, the probability of death or serious injury, and prior incidents of violence of relevance to the situation. *See* Utah Code Ann. § 76–2–402(5)(a)–(e) (Supp.2011).

2. The majority opinion relies on Rachel's testimony that her trip with Luis took fifteen to twenty minutes and Luis's testimony that the only phone available to Rachel was a home phone to infer that at least fifteen minutes elapsed between the time of Rachel's call to

Berriel and the subsequent altercation. I am not inclined to reach the same inference in light of the ubiquitous presence of mobile phones in today's culture and particularly amongst young adults. Rachel did not testify as to exactly when or from where she called Berriel, and in the absence of clear testimony as to the timing of the phone call, I believe that the jury could reasonably have concluded that the interval may well have been somewhat less than fifteen minutes.

home and the altercation between Luis and Berriel occurred. The majority concludes that from the time Luis arrived home until the time of the stabbing, Luis had not "threatened, touched, harmed, or even approached Rachel in any way, nor had he exhibited any weapons," and that, as a result, "there was no evidence that Rachel was in imminent danger at the time Berriel attacked Luis." *See supra* ¶ 5.

¶ 23 In my view, once Berriel had a reasonable basis to believe that Rachel was in imminent danger due to her phone call, his actions in her defense were potentially justifiable under Utah Code section 76–2–402 *until* such time as Berriel had reason to believe that the danger to Rachel had passed.[3] There was testimony to suggest that Berriel's observations of Luis's arrival at Rachel's house were too brief and hurried to have given Berriel notice that Luis no longer posed a threat to Rachel. Carlisle testified that when he arrived at Rachel's house with Berriel, neither Rachel nor Luis was there. The State then asked Carlisle, "So what did you do?" Carlisle responded, "We were walking back to the car and that guy drove up, her boyfriend, jumped out of the car and ran towards [Berriel]."

¶ 24 Based on this testimony, reasonable jurors could conclude that as soon as Luis arrived, he jumped from his car and charged at Berriel in an angry and hostile manner. These actions raised the additional issue of self-defense, but they also deprived Berriel of any meaningful opportunity to revise his assessment of the ongoing danger to Rachel. Absent such an opportunity, Berriel had insufficient information and opportunity to believe that the threat to Rachel had dissipated and was therefore entitled to act in the continued belief that Rachel remained in danger as well as to defend himself. Carlisle's testimony thus provides some reasonable basis upon which to conclude that Berriel reasonably believed that Rachel *remained* in danger and that using force against Luis in her defense remained justified.[4]

¶ 25 In light of the evidence, an instruction on defense of others was critical to Berriel's defense, not only for its potential to provide an independent justification for his presence and subsequent actions, but also as a necessary complement to the self-defense instruction. The jury was instructed that Berriel was not justified in using force in self-defense if he was the "aggressor," [5] and there was certainly evidence to suggest that Berriel had gone to Rachel's house, armed, with an intent to confront Luis. A defense-of-others instruction would have allowed Berriel to argue that this decision was a legally justified act in Rachel's defense and did not render Berriel the aggressor as between Berriel and Luis.[6] Thus, the defense-of-others instruction was necessary to fully implement the self-defense instruction and to provide Berriel with a seamless defense if he could convince the jury that he first acted in defense of Rachel and then transitioned into

---

3. I recognize that the mere passage of time could, in some circumstances, give reason to infer that a particular threat has ended. However, the potentially quite short period of time between Rachel's phone call and the ultimate altercation in this case does not give rise to such an inference.

4. Carlisle's version of events, if believed, distinguishes this case from the authorities the majority cites in which the person to be defended was either not present or had clearly broken free from the hostilities. *See Harris v. Scully*, 779 F.2d 875, 877, 879 (2d Cir.1985) (denying instruction where defendant's mother apparently remained inside a house, altercation took place outside the house, and defendant's brother had broken free from the fight); *State v. Hernandez*, 253 Kan. 705, 861 P.2d 814, 820 (1993) (denying instruction where person allegedly defended was not present).

5. The instruction stated, in part, "A person is not justified in using force which is intended or likely to cause death or serious bodily injury if he: ... was the aggressor or was engaged in combat by agreement...."

6. Such an argument was particularly vital here, where Berriel was charged with possession of a weapon with intent to assault. The jury could have concluded that Berriel possessed the weapon at the time of the phone call and at all times thereafter. Thus, it was critical for Berriel to be allowed to argue that his possession of the knife was with a legally-justifiable intent to potentially defend Rachel or himself if necessary, rather than any intent to commit a criminal assault against Luis.

also defending himself as Luis turned his violence towards him.

¶ 26 I also note that it is highly relevant that the threat to Rachel was one of domestic violence. This court has recognized on multiple occasions that "a domestic violence complaint is one of the most potentially dangerous, volatile arrest situations confronting police." *State v. Vallasenor–Meza,* 2005 UT App 65, ¶ 16, 108 P.3d 123 (internal quotation marks omitted); *see also State v. Comer,* 2002 UT App 219, ¶ 25, 51 P.3d 55 (same); *State v. Richards,* 779 P.2d 689, 691 (Utah Ct.App.1989) (same). In *State v. Vallasenor–Meza,* 2005 UT App 65, 108 P.3d 123, police responded to reports of a domestic dispute at the defendant's house. The defendant was initially reluctant to cooperate with the officers, but eventually "explained to the officers that there had been a fight, but the woman involved had since gone to work." *Id.* ¶ 18. Despite this explanation, the court determined that exigent circumstances justified the officers entering the house without a warrant due to their reasonable belief that "the victim was potentially inside the residence injured or unconscious, and that their immediate intervention was necessary." *Id.* ¶ 19.

¶ 27 If the jury was to believe Carlisle's version of events, Berriel's defense-of-others claim seems even stronger than the claim of police exigency in *Vallasenor–Meza.* Berriel was aware of a history of domestic violence between Luis and Rachel, became aware of a new and potentially ongoing domestic violence incident perpetrated by Luis against Rachel, and went to assist Rachel against that clear threat. When Berriel came into contact with Luis and Rachel, it was not obvious that their hostilities were continuing but it was also not obvious that they had ceased. Berriel did not know if Rachel was "injured or unconscious," *see id.,* if she was being held in Luis's vehicle against her will or under duress of his threats, or if Luis's beating of her would continue as soon as Luis was not busy driving. Importantly, Berriel's ability to confirm that Rachel was no longer

in danger was short-circuited by Luis's jumping from the car and running at Berriel—an aggressive act that was entirely consistent with the violence against Rachel that had brought Berriel to the scene in the first place.

¶ 28 In light of Carlisle's testimony, the interplay between self-defense and defense of others in this case, and the clear and very real danger presented by Luis's repeated acts of domestic violence, Berriel was entitled to his requested instruction on the defense of others.[7] The district court's refusal to give such an instruction deprived Berriel of the opportunity to present a full and fair defense and, in my opinion, merits reversal of his convictions. For these reasons, I respectfully dissent from the majority opinion on this issue but concur in the remainder.

---

7. Of course, a jury would not be obligated to ultimately find the facts in Berriel's favor on his defense-of-others defense or any other issue. Nevertheless, he was entitled to make his arguments to a properly instructed jury.