*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 19**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Respondent,*

*v.*

DARREN BERRIEL,
*Defendant and Petitioner.*

No. 20110926
Filed April 5, 2013

Fourth District, Provo Dep't
The Honorable Gary D. Stott
No. 081402953

On Certiorari to the Utah Court of Appeals

Attorneys:

John E. Swallow, Att'y Gen., Ryan D. Tenney, Asst. Att'y Gen.,
for respondent

Douglas J. Thompson, Provo, for petitioner

JUSTICE DURHAM authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE PARRISH and JUSTICE LEE joined.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1     On certiorari, we consider whether the court of appeals erred in affirming the district court's refusal to instruct the jury on defense of a third person. We consider whether the evidence supports defendant Darren Berriel's theory that he stabbed the victim in defense of a third person under Utah Code section 76-2-402. We agree with the court of appeals that there is no basis in the evidence to support this theory and accordingly affirm.

### BACKGROUND

¶2     Darren Berriel was convicted of aggravated assault for stabbing the victim, Luis. On the evening of the stabbing, Mr. Berriel received a phone call from Rachel, Luis's girlfriend. Rachel told Mr. Berriel that Luis "had been hurting [her]" and asked him "to come over and help." According to Mr. Berriel's friends who were

with him when he received the call, Rachel was screaming and cry-ing over the phone. After the phone call, Mr. Berriel told his friends that Rachel "was getting beat up" by Luis and that he needed to go to her house to help her.

¶3     Mr. Berriel and at least three friends immediately drove to the house where Rachel and Luis lived with Rachel's family. On the way, Mr. Berriel called Krissy, Rachel's friend, and asked her to "get Rachel away from the house." In the meantime, Luis and Rachel had left the house and driven to pick up Rachel's thirteen-year-old brother.

¶4     Luis and Rachel returned to the house with Rachel's brother shortly after Mr. Berriel and his friends arrived. After park-ing on the street in front of the house, Rachel and her brother exited from the passenger's side of the car onto the sidewalk, and Luis exited from the driver's side onto the street. Mr. Berriel and his friends were waiting on the opposite side of the street. Mr. Berriel and Luis approached one another, meeting in the middle of the road. According to Luis's testimony, he told Mr. Berriel, "[Y]ou don't need that knife to fight with me, if you want to fight with me." According to another observer, Luis told Mr. Berriel, "You don't know what's going on, stay out of it."

¶5     Mr. Berriel then thrust a knife toward Luis's torso. Luis moved his arms to protect his abdomen, and the knife slashed his left forearm, causing a laceration that required stitches. Luis then ran toward the house to get his dog, and Mr. Berriel and his friends drove away. Meanwhile, Rachel stood at least fifteen feet away from where the stabbing occurred and was not involved in the altercation.

¶6     Mr. Berriel later turned himself in to law enforcement and was prosecuted for the stabbing. At trial, the district court instructed the jury on self-defense. However, the court refused to instruct the jury on defense of a third person because it determined that Mr. Berriel's theory that he stabbed Luis in defense of Rachel was "not supported by the evidence." Following his conviction for aggra-vated assault, Mr. Berriel appealed the district court's refusal to instruct the jury on defense of a third person.[1] A divided panel of the

---

[1] The jury also convicted Mr. Berriel of possession of a dangerous weapon with intent to assault. However, the court of appeals vacated this conviction because the jury was not informed "that it had to find a separate factual basis for the possession . . . conviction beyond the possession necessary to commit the aggravated assault."

(continued...)

court of appeals affirmed, explaining that "a jury could not reasonably have concluded" that Rachel was in imminent danger at the time of the assault. *State v. Berriel*, 2011 UT App 317, ¶ 6, 262 P.3d 1212. Mr. Berriel petitioned this court for certiorari, and we agreed to consider whether the court of appeals erred in affirming the district court's refusal to give a jury instruction on defense of a third person.

## STANDARD OF REVIEW

¶7 "On certiorari, we review for correctness the decision of the court of appeals, not the decision of the district court. The correctness of the court of appeals' decision turns on whether that court correctly reviewed the trial court's decision under the appropriate standard of review." *Utah Cnty. v. Butler*, 2008 UT 12, ¶ 9, 179 P.3d 775 (internal quotation marks omitted).

## ANALYSIS

### I. THE DISTRICT COURT'S REFUSAL TO ISSUE A JURY INSTRUCTION IS REVIEWABLE FOR ABUSE OF DISCRETION

¶8 "[T]he refusal to give a jury instruction is reviewed for abuse of discretion . . . ." *Miller v. Utah Dep't of Transp.* 2012 UT 54, ¶ 13, 285 P.3d 1208. The precise amount of deference we afford on review depends on the type of issue presented. On issues that are primarily or entirely factual, we afford significant deference; on issues that are primarily or entirely legal in nature, we afford little or no deference.

¶9 A district court's refusal to instruct the jury on a defendant's theory of the case presents questions on both sides of the spectrum. The issue of whether the record evidence, viewed in its totality, supports the defendant's theory of the case is primarily a factual question. Factual determinations are entitled to more deference than any other kind of determination, largely for reasons of institutional competency. *Manzanares v. Byington* (*In re Adoption of Baby B.*), 2012 UT 35, ¶ 40, __ P.3d __. Trial courts are better factfinders than appellate courts. *See id.* For example, here, the district court's first-hand familiarity with the testimony and other evidence puts it in a better position than an appellate court to determine whether the evidence supports the defendant's theory.

---

[1] (...continued)
*State v. Berriel*, 2011 UT App 317, ¶ 16, 262 P.3d 1212. We have not been asked to review the vacatur.

¶10     In contrast, the issue of whether to instruct the jury on a theory that *is* supported by the evidence presents a legal question. When the record evidence supports a defendant's theory, the defendant "is legally entitled to have [an] instruction [on that theory] given to the jury. In those circumstances, refusal constitutes an error of law, and an error of law always constitutes an abuse of discretion." *Miller*, 2012 UT 54, ¶ 13 n.1.

¶11     The court of appeals employed a correctness standard of review, in accordance with our precedent at the time it issued its opinion. *State v. Berriel*, 2011 UT App 317, ¶ 4, 262 P.3d 1212 (citing *State v. Gallegos*, 2009 UT 42, ¶ 10, 220 P.3d 136). This error was harmless to Mr. Berriel. In fact, the correctness standard was more favorable to him than the abuse-of-discretion standard we set forth in this opinion. As explained below, we hold that under either standard of review, the district court did not err in refusing to instruct the jury on defense of a third person.

## II. THE COURT OF APPEALS CORRECTLY HELD THAT THE DISTRICT COURT DID NOT ERR BECAUSE MR. BERRIEL'S THEORY IS NOT SUPPORTED BY THE EVIDENCE

¶12     A "[d]efendant is entitled to have the jury instructed on [the defense's] theory of the [case] if there is any basis in the evidence to support that theory." *State v. Brown*, 607 P.2d 261, 265 (Utah 1980). Mr. Berriel contends that the record in this case supports his theory that he stabbed Luis in defense of Rachel.

¶13     Under Utah Code section 76-2-402(1)(a), "[a] person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person or a third person against another person's imminent use of unlawful force."[2] "When interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (internal quotation marks omitted). The key terms in section 76-2-402 for purposes of this case are "imminent" and "necessary."

---

[2]  At the time of Mr. Berriel's offense, current Utah Code section 76-2-402 was located at 76-1-601 of the Code. We cite to the current version because it is substantively identical to the provision in force at the time of the offense.

¶14    Black's Law Dictionary defines "imminent danger" as "[a]n immediate, real threat to one's safety" and as "[t]he danger resulting from an immediate threatened injury." 450 (9th ed. 2009). Webster's Dictionary defines "imminent" as "[a]bout to occur at any moment" and as "impending." WEBSTER'S II NEW COLLEGE DICTIONARY 553 (1995). The imminence requirement distinguishes lawful defensive force from two forms of unlawful force: that which comes too soon and that which comes too late. "A preemptive strike against a feared aggressor is illegal force used too soon; and retaliation against a successful aggressor is illegal force used too late." George P. Fletcher, BASIC CONCEPTS OF CRIMINAL LAW 133–34 (1998). Defensive force "is neither a punishment nor an act of law enforcement" but rather "an act of emergency that is temporally and materially confined[,] with the narrow purpose of warding off the pending threat." Onder Bakircioglu, *The Right to Self-Defence in National and International Law: The Role of the Imminence Requirement*, 19 IND. INT'L & COMP. L. REV. 1, 21 (2009). Webster's Dictionary defines "necessary" as "[a]bsolutely required," "indispensable," and "[u]navoidably determined by prior conditions or circumstances." WEBSTER'S II NEW COLLEGE DICTIONARY 731 (1995). The necessary requirement distinguishes wanton violence from force that is crucial to averting an unlawful attack. Force is justifiable under section 76-2-402 only if a reasonable belief in the imminence of unlawful harm and in the necessity of defensive force coincide with the defendant's use of force.

¶15    In this case, Mr. Berriel argues that three pieces of evidence support his theory that he reasonably believed Rachel was in imminent danger at the time of the stabbing: (1) Rachel's phone call for help; (2) the fact that at the time of the stabbing, Rachel was still in Luis's presence and that Luis instructed Mr. Berriel to "stay out of it"; and (3) Luis's "violent character and his history of violence toward" Rachel.

¶16    We agree that Rachel's phone call for help suggested that she was in imminent danger *at the time of the call*. However, intervention by Mr. Berriel at that time was impossible because he was in a different location than Rachel. When Mr. Berriel encountered Rachel and Luis some time after the phone call, he had no basis for reasonably believing that Rachel continued to be in "imminent" danger or that it was "necessary" for him to stab Luis. As the court of appeals summarized,

> when Rachel and Luis arrived at their residence . . . they
> did not appear even to be arguing. There was no evi-

dence that Luis, during the time he could have been observed by Berriel, had threatened, touched, harmed, or even approached Rachel in any way, nor had he exhibited any weapons. In fact, from the point at which he emerged from the car, Luis's attention was directed entirely at Berriel, who was coming at him with a knife. . . . Rachel was at least fifteen feet away and out of the path of the confrontation.

*Berriel*, 2011 UT App 317, ¶ 5. We agree with the court of appeals that, on these facts, Mr. Berriel could not have reasonably believed that Rachel was in imminent danger at that time or that his stabbing of Luis was necessary to defend her.[3]

¶17    In dissent, Judge Thorne reasoned that "once Berriel had a reasonable basis to believe that Rachel was in imminent danger due to her phone call, his actions in her defense were potentially justifiable under Utah Code section 76-2-402 *until* such time as Berriel had reason to believe that the danger to Rachel had passed." *Id.* ¶ 23 (Thorne, J., concurring and dissenting). We disagree. An aggressor's act of violence does not give a would-be rescuer a continuing license to attack the aggressor at any time until the would-be rescuer is assured of the victim's safety. As the majority of the court of appeals explained, "it is the imminence of harm to another that is central to the legal justification of violence to prevent it; otherwise, this humane law of justification could be extended to countenance retribution or vigilantism." *Id.* ¶ 6 (majority opinion). Given the abusive relationship between Luis and Rachel, there might never have come a time when Mr. Berriel "had reason to believe that the danger to Rachel had passed." Thus, while Mr. Berriel's ongoing concern for Rachel's safety was appropriate, his assault on Luis at a time when Luis was not harming or threatening Rachel was not justifiable.

---

[3] Although our analysis focuses on whether the evidence supports a conclusion that Mr. Berriel *reasonably* believed his use of force was necessary to defend Rachel from imminent harm, Mr. Berriel appears to admit that he may not have even *subjectively* held this belief. In his opening brief, Mr. Berriel states that en route to Rachel's house, he called her friend Krissy and told her "to get Rachel away from the house." Thus, he seems to concede that he drove to the house to confront Luis, not to rescue Rachel from any immediate harm.

¶18 This case is analogous to *State v. Hernandez*, 861 P.2d 814 (Kan. 1993), in which the Kansas Supreme Court ruled that a defendant who killed his sister's abusive husband was not entitled to a jury instruction on defense of a third person. The husband had abused the sister throughout their relationship and had even threatened to take her life. *Id.* at 816–17. The killing of the husband occurred at the industrial plant where the defendant, the sister, and the husband were all employed. *Id.* at 816–18. On the morning of the killing, the husband "told [the sister] that she had until 11 o'clock that morning to make up her mind." *Id.* at 817. Upon learning of this confrontation, the defendant feared the husband would harm or kill the sister at eleven o'clock. *Id.* Sometime after nine o'clock, the defendant retrieved a gun from his car and invited the husband outside to talk. *Id.* When the defendant thought he saw the husband reaching for a knife, the defendant shot the husband. *Id.* Having survived the initial attack, the husband said, "Now, I'm gonna kill you too" and began running toward the plant. *Id.* at 818. Thinking that the word "too" indicated that the husband intended to kill the defendant's sister, the defendant continued to shoot at the husband as he ran toward and into the plant. *Id.* The husband died from the gunshot wounds. *Id.*

¶19 The Kansas Supreme Court concluded that "a rational factfinder could not find that [the defendant] acted in defense of his sister . . . at the time he shot [the husband]" because the defendant, "who was armed, approached [the husband], asked him to come outside, and then provoked the conflict." *Id.* at 820. "[T]he only imminent danger was that created by [the defendant] himself." *Id.* The court held that "[t]he history of violence" and the threat of future harm, "could not turn the killing into a situation of imminent danger." *Id.*

¶20 Similarly, we conclude that Luis's past abuse of Rachel and the likelihood of future abuse cannot justify Mr. Berriel's assault on Luis. Like the defendant in *Hernandez*, Mr. Berriel armed himself, approached the abusive partner, and provoked a violent conflict. *See id.* at 820. Mr. Berriel is correct that under section 76-2-402(5), the aggressor's "prior violent acts or violent propensities" and "any patterns of abuse or violence in the parties' relationship" are relevant to a jury's assessment of whether a defendant reasonably believed harm was imminent. However, relevancy and sufficiency are distinct concepts. We agree with the Kansas Supreme Court that, standing alone, a history of violence or threats of future violence are legally insufficient to create "a situation of imminent danger." *Id.* at 820. And we see no other facts in the record which, taken together with

Luis's history of violence, render erroneous the district court's refusal to instruct the jury on defense of a third person.

## CONCLUSION

¶21    We agree with the court of appeals that there is no basis in the evidence to support Mr. Berriel's theory that he acted in defense of Rachel when he stabbed Luis. Thus, we affirm the court of appeals' holding that the district court did not err in refusing to instruct the jury on defense of a third person.