2014 UT App 279

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
ROBERT RUPERT,
Defendant and Appellant.

Opinion
No. 20130684-CA
Filed November 28, 2014

First District Court, Brigham City Department
The Honorable Ben H. Hadfield
No. 121100345

Randall W. Richards, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE JAMES Z. DAVIS authored this Opinion, in which JUDGES
STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN concurred.

DAVIS, Judge:

¶1     Robert Rupert appeals his conviction of assault by a prisoner. We affirm.

BACKGROUND

¶2     On November 30, 2012, Rupert was an inmate at the Box Elder County Jail and housed in a cell with four other prisoners, including the victim, James Pettus. Rupert and Pettus did not get along and often argued with each other. Around 2:00 p.m., Rupert and another inmate, Gregorio Cisneros, attacked Pettus. Pettus

suffered a broken nose, two black eyes, and a "cauliflowered" ear. The incident was recorded by a security camera, and the footage was played, without sound, at Rupert's trial based on the parties' stipulation.

¶3     The video shows the cell mates occasionally talking with each other, watching television, sitting in their bunks, and otherwise idly passing the time. About seven minutes into the recording, while Pettus changed into a pair of athletic shoes, Cisneros engaged Pettus in conversation and made gestures seeming to invite Pettus to fight. Pettus remained seated and continued putting on his shoes. Cisneros grew more visibly agitated, gesturing between Pettus and Rupert. Pettus simply nodded, and when he finished tying his shoes, he stood and faced Cisneros, who assumed a boxing stance and began jabbing punches in Pettus's direction. Pettus remained in a passive stance, with his hands by his sides. Rupert then jumped Pettus from behind and struck Pettus on the back of the head. Rupert and Pettus eventually fell to the floor, where Pettus became pinned under Rupert. While on the floor, Rupert continued to punch Pettus in the head and legs and bit his ear. Within a minute, the fight was over. Rupert got up and returned to sitting on his bunk. He had blood on his hands, face, beard, and clothing. Pettus remained on the ground, breathing heavily. His face, right arm, and hands were covered in blood, and blood was smeared on the floor around him. Rupert stood to retrieve his shoe that came off during the fight and motioned for a guard's attention. Shortly after the guards arrived in the cell, Pettus began convulsing on the floor.

¶4     Rupert's theory at trial was that he acted in self-defense. The trial court had denied Rupert's pretrial motion in limine in which he sought to use evidence of Pettus's various jail disciplinary write-ups to bolster Rupert's self-defense claim. The court permitted Rupert to "elicit general reputation or opinion testimony regarding Mr. Pettus's character" but ruled that specific instances of Pettus's prior conduct could not be raised except to discredit opinion or reputation testimony on cross-examination.

¶5     At trial, Pettus admitted that he was a convicted felon and explained that he was incarcerated at the time of the fight with Rupert "for drinking and just being stupid." Pettus testified that he had a hard time in jail and admitted that he did not get along with Rupert and that he had threatened Rupert before, but that they ultimately "blew off" each other's threats because that was "just the environment."

¶6     Rupert testified that there were no problems in the cell until Pettus arrived. Rupert claimed that Pettus directed sexual gestures at him and repeatedly threatened to hurt Rupert and to "make [him] his bitch." Rupert testified that the evening before the fight, Pettus had threatened to hit him with a cup and that Pettus continued to verbally threaten Rupert on the morning of the fight. Rupert explained that he intervened when Cisneros engaged Pettus because he "was scared," his anxiety was "real high," and his "mind was racing."

¶7     At the close of the evidence, the trial court denied Rupert's request for a self-defense jury instruction, stating that there was not sufficient evidence to warrant the instruction. The jury convicted Rupert, and Rupert timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶8     Rupert argues that the trial court incorrectly denied his request for a self-defense jury instruction. A trial court's "refusal to give a jury instruction is reviewed for abuse of discretion." *State v. Berriel*, 2013 UT 19, ¶ 8, 299 P.3d 1133 (citation and internal quotation marks omitted).

¶9     Second, Rupert argues that the trial court abused its discretion by denying his motion in limine and prohibiting evidence of Pettus's prior bad acts from being admitted. We review a trial court's decision to admit or exclude evidence of other crimes, wrongs, or bad acts under rule 404(b) of the Utah Rules of Evidence

for an abuse of discretion. *State v. Decorso*, 1999 UT 57, ¶ 18, 993 P.2d 837.

¶10 Third, Rupert claims that he received ineffective assistance from his trial counsel due to counsel's failure to object on gruesomeness grounds to the admission of the final few minutes of the recording after the altercation had ended and during which Pettus could be seen covered in blood and convulsing. "[A] claim of ineffective assistance of counsel . . . raised for the first time on appeal without a prior evidentiary hearing . . . presents a question of law." *State v. Bryant*, 965 P.2d 539, 542 (Utah Ct. App. 1998). However our review of a trial attorney's "performance must be highly deferential; otherwise the distorting effects of hindsight would produce too great a temptation for courts to second-guess trial counsel's performance on the basis of an inanimate record." *Id.* (citation and internal quotation marks omitted).

¶11 Last, Rupert claims the trial court plainly erred by admitting the allegedly gruesome portion of the video into evidence. To demonstrate plain error, a defendant must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

ANALYSIS

I. Self-Defense Instruction

¶12 Rupert argues that the trial court's refusal to give the jury his requested instruction on self-defense prohibited him from adequately presenting his theory of the case. The trial court denied Rupert's request for a self-defense instruction after concluding that there was no basis in the evidence to support the defense.

¶13    "Each party is . . . entitled to have the jury instructed on the law applicable to its theory of the case if there is any reasonable basis in the evidence to justify it." *State v. Torres,* 619 P.2d 694, 695 (Utah 1980). We afford significant deference to "[a] district court's refusal to instruct the jury on a defendant's theory of the case" when its decision is based on its determination that "the record evidence, viewed in its totality," does not support "the defendant's theory of the case." *State v. Berriel*, 2013 UT 19, ¶ 9, 299 P.3d 1133.

¶14    "A person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person or a third person against another person's imminent use of unlawful force." Utah Code Ann. § 76-2-402(1)(a) (LexisNexis 2012). The trial court based its application of the self-defense statute on our supreme court's decision in *State v. Berriel*, 2013 UT 19, 299 P.3d 1133. In that case, the supreme court considered the trial court's refusal to instruct the jury on defense of a third person. *Id.* ¶ 21. There, Berriel was contacted by a female friend who asked him for help with her abusive boyfriend. *Id*. ¶ 2. Berriel immediately drove to the friend's house. *Id.* ¶¶ 3–4. Berriel and the boyfriend approached each other and met in the middle of the road, where Berriel thrust a knife toward the boyfriend, injuring the boyfriend's arm. *Id.* ¶¶ 4–5. Berriel's theory at trial was that he acted in self-defense and in defense of a third person, his friend. *Id.* ¶ 6. The trial court provided the jury with a self-defense instruction but "refused to instruct the jury on defense of a third person because it determined that Mr. Berriel's theory . . . was 'not supported by the evidence.'" *Id.*

¶15    The supreme court affirmed, noting that the imminent danger requirement in the Utah Code's definition of self-defense functions to "distinguish[] lawful defensive force from two forms of unlawful force: that which comes too soon and that which comes too late." *Id.* ¶ 14. The court elaborated, "A preemptive strike against a feared aggressor is illegal force used too soon; and retaliation against a successful aggressor is illegal force used too

late." *Id.* (citation and internal quotation marks omitted). The court concluded that although the friend's "phone call for help suggested that she was in imminent danger *at the time of the call*," by the time Berriel arrived at her house, "he had no basis for reasonably believing that [the friend] continued to be in 'imminent' danger or that it was 'necessary' for him to stab [the boyfriend]." *Id.* ¶ 16. The court concluded "that, standing alone, a history of violence or threats of future violence are legally insufficient to create a 'situation of imminent danger.'" *Id.* ¶ 20 (quoting *State v. Hernandez*, 861 P.2d 814, 820 (Kan. 1993)).

¶16   Here, Rupert argues that the reasonableness and imminence elements of self-defense are supported by his testimony that he feared Pettus; that he had been threatened by Pettus the night before the altercation occurred and again the morning of the altercation; that the night before the fight, after Pettus's threat with a cup, Rupert sent two notes to jail staff informing them of his fear and explaining his belief that Pettus posed a "security risk"; and that he knew of Pettus's "behavioral issues in the jail." In addition, he testified that Pettus is "quite a bit bigger." Rupert testified that he interpreted Pettus's act of putting on athletic shoes near Rupert's bunk as Pettus "booting-up," i.e., preparing to fight, and that he intervened between Pettus and Cisneros out of fear.

¶17   After discussing *Berriel*, the trial court rejected Rupert's request, stating, "Since even the possibility of future abuse doesn't justify a preemptive strike, you can't cold-cock somebody from behind because you're afraid, if you don't, they might face you and hurt you." We agree. Although Rupert may have been threatened in the past and may have had a general fear of Pettus acting on a threat in the future, the video footage clearly shows that Rupert was not in imminent danger of being attacked by Pettus and that Rupert's use of force was not necessary to defend himself. Indeed, as the trial court observed, the manner in which Pettus faced Cisneros, with his hands by his sides and palms open, suggests that Pettus did not "pos[e] any imminent threat to Mr. Cisneros, who [was] acting like he[ was] ready to punch [Pettus]." Regardless of

whether Rupert's claim of self-defense was "seminal" to his case, as he asserts it was, it does not entitle him to a jury instruction on a matter that is nonetheless unsupported by the evidence. *See State v. Standiford*, 769 P.2d 254, 264 (Utah 1988) ("It is error to give an instruction if there is no evidence to support it and if it could be misleading."). Accordingly, the trial court did not abuse its discretion in refusing to instruct the jury on self-defense.

## II. Bad Acts Evidence

¶18    Rupert next argues that the trial court abused its discretion when it denied his motion in limine to use evidence of Pettus's "significant and often violent bad acts while in custody to bolster [Rupert's] claim that he acted in self-defense." The trial court granted Rupert's motion in part by permitting him to "elicit general reputation or opinion testimony regarding Mr. Pettus's character," while denying his request "to elicit specific instances of Mr. Pettus's conduct unless used on cross-examination to discredit opinion or reputation testimony of Mr. Pettus's character." The court described Rupert's analysis as insufficient "to show that specific instances of Mr. Pettus's conduct are admissible," and it noted that Rupert failed to "allege[] that Mr. Pettus's character is an essential element of a charge, claim or defense." The court denied Rupert's "cursory" attempt to argue for the admission of the evidence under rule 404(b), stating, "Defendant is attempting to admit the evidence to show Mr. Pettus's bad character, in order to show that on the date of the offense he acted in conformity with the character. This is exactly what Rule 404(b) prohibits."

¶19    On appeal, Rupert frames his argument as arising not out of rule 404(b), but out of the self-defense statute, which he argues "provides specific examples of 'proper non-character purposes' of evidence of bad acts . . . that a trier of fact may consider in determining the imminence or reasonableness of the defendant['s] self-defense claim."[1] *See* Utah Code Ann. § 76-2-402(5) (LexisNexis 2012). This argument is not preserved, and "[a]s a general rule,

---

1. For which we have ruled Rupert is not entitled to an instruction.

claims not raised before the trial court may not be raised on appeal." *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. Additionally, Rupert has not addressed the grounds on which the trial court actually ruled on his motion. "Utah appellate rules require the appellant to address reasons why the district court's [ruling] should be overturned," which necessarily requires an appellant "to allege specific errors of the lower court." *See Allen v. Friel*, 2008 UT 56, ¶¶ 7, 14–15, 194 P.3d 903; *see also* Utah R. App. P. 24(a)(9). Accordingly, we do not address this issue further.

## III. Video Evidence

¶20 Last, we address Rupert's remaining two claims that he received ineffective assistance of trial counsel and that the trial court plainly erred based on the admission of the post-fight portion of the video that shows Pettus convulsing on the floor in a "pool" of his own blood. Rupert asserts that the footage depicting "the aftermath of the fight . . . is gruesome" and has "absolutely no probative value." He contends that the prosecutor shared this belief, pointing to the prosecutor's statement to prospective jurors in voir dire that the evidence included a video that "will be somewhat disturbing," and to the prosecutor's comment in his opening argument "forewarn[ing]" the jurors that the video could be considered "disturbing" and "difficult."

¶21 To demonstrate that he received ineffective assistance of counsel, a defendant

> must (i) identify specific acts or omissions by counsel that fall below the standard of reasonable professional assistance when considered at the time of the act or omission and under all the attendant circumstances, and (ii) demonstrate that counsel's error prejudiced the defendant, i.e., that but for the error, there is a reasonable probability that the verdict would have been more favorable to the defendant.

*State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993) (citing *Strickland v. Washington,* 466 U.S. 668, 690–91 (1984)). To demonstrate plain error, a defendant must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *Id.* at 1208–09. The ineffective assistance "prejudice test is equivalent to the harmfulness test we apply in determining plain error." *Id.* at 1225.

¶22    To satisfy the first prong of both the ineffective assistance test and the plain error analysis, Rupert must demonstrate that the portion of the video he argues should have been excluded actually constitutes gruesome evidence. *See State v. Stapley*, 2011 UT App 54, ¶ 10, 249 P.3d 572 (noting that gruesome photographs "make up one" category of evidence that is "uniquely subject to being used to distort the deliberative process and improperly skew the [trial's] outcome" (alteration in original) (citation and internal quotation marks omitted)). A court may consider "a variety of factors" when determining whether an image is gruesome, including "whether the photograph is in color or black and white; whether it is an enlargement or close-up shot; when the photo was taken in relation to the crime; and whether other details in the photo, aside from the victim, may exacerbate the photograph's impact on the viewer." *Id.* ¶ 15 (citation and internal quotation marks omitted); *see also State v. Dibello*, 780 P.2d 1221, 1229–30 (Utah 1989) (analyzing the admissibility of allegedly gruesome video evidence using the same factors used to analyze photograph evidence for gruesomeness). "Gruesome" is synonymous in this regard with "grisly and hideous" or something that "inspir[es] horror or repulsion." *Stapley*, 2011 UT App 54, ¶ 15 (alteration in original) (citation and internal quotation marks omitted).

¶23    In *State v. Lafferty*, 749 P.2d 1239 (Utah 1988), the supreme court addressed whether two particular photographs and video evidence were gruesome and therefore admitted in error. *Id.* at 1257–58. There, the defendant was convicted of murdering his sister-in-law and her infant daughter. *Id.* at 1241. One of the

photographs the defendant challenged as inadmissible was a black and white image of the infant's body, "not as it was found, but repositioned in the crib so that the gaping neck wound and blood-covered face and body could be seen," along with a baby bottle and toy next to the crib. *Id.* at 1257. The other photograph was in color and showed the sister-in-law's body with "dried blood on the face, arms, back, and legs; a large pool of blood on the kitchen floor; the neck wound; and the bruised and swollen lips." *Id.* The court held that these were "not merely crime-scene photographs" but carried with them a "strong" "emotional impact" that outweighed the "limited" probative value of the photos, which went toward proving matters that were "cumulative of the testimony" offered by several witnesses. *Id.* Ultimately, however, the court determined that the admission of these photographs did not amount to a prejudicial error given the abundance of evidence supporting the defendant's conviction. *Id.*

¶24   The video evidence challenged in *Lafferty* showed the crime scene as it was found by police and included some shots of the victims' bodies. *Id.* at 1258. The *Lafferty* court noted that the video "was of very poor quality and was mainly black and white, although a few portions were in color[, and s]ome parts were intentionally blacked-out." *Id.* It held that the shots containing the bodies were "not particularly gruesome or inflammatory" because the camera did not linger on the bodies, the views of the sister-in-law's body "were taken at a distance" with "[f]ew details . . . visible," and the shots of the infant were in black and white and showed only the "body slumped in a crib, facing away from the camera, with no injuries visible." *Id.* The court concluded that the video was admissible because, "[o]verall, the videotape is most properly characterized as a view of the crime scene, with some shots of the corpses," rather than "just a grisly view of the bodies." *Id.*

¶25   Here, to demonstrate that the challenged footage is gruesome, Rupert relies on the prosecutor's statements during voir dire and opening arguments in which the prosecutor describes the footage as "disturbing." Rupert also notes that the trial court

sustained his trial counsel's objection that the post-fight content of the video was not relevant even though counsel's objection was not made until the contested content had already been played for the jury. Rupert concludes that the video footage in his case "offered basically the same irrelevant information that was offered in the *Lafferty* case."

¶26    Rupert has not demonstrated that the video footage is gruesome. Indeed, in *Lafferty*, whether the challenged evidence accurately depicted the crime scene factored into the court's rulings on whether an image was gruesome, and here, there is no doubt that the video footage accurately shows the crime scene as it was found by the jail guards. Likewise, Rupert makes no claim that the post-fight footage qualifies as "gruesome" under *Lafferty*, just that the prosecutor stated it was "disturbing." However, "[a] photograph is not gruesome . . . merely because it is unpleasant to view." *Stapley*, 2011 UT App 54, ¶ 15. Accordingly, having failed to demonstrate that the post-fight footage was gruesome, Rupert's ineffective assistance and plain error arguments necessarily fail. *See generally State v. Litherland*, 2000 UT 76, ¶ 8, 12 P.3d 92 (noting that the appellant "bears the burden of establishing that his trial counsel was ineffective" and "the burden of establishing that the trial court committed plain error").

## CONCLUSION

¶27    We affirm the trial court's denial of Rupert's request for a self-defense jury instruction. Rupert has not adequately briefed or preserved his argument that specific examples of Pettus's prior bad acts were wrongly excluded, and he has failed to establish that he received ineffective assistance of trial counsel or that the trial court committed plain error.

———————