2026 UT App 95

# THE UTAH COURT OF APPEALS

ESTHER CANTEROS-ALVAREZ,
Appellee,
*v.*
LUPITA ANGEL GREEN,
Appellant.

Opinion
No. 20241094-CA
Filed June 19, 2026

Third District Court, West Jordan Department
The Honorable James D. Gardner
Commissioner Russell Minas
No. 244904978

Kendra M. Brown and Taylor P. Kordsiemon,
Attorneys for Appellant

Taylor P. Webb and Olivia C. Shaughnessy,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1 Esther Canteros-Alvarez obtained a protective order against Lupita Angel Green, and this protective order was based on a text that Green had sent that contained what Canteros-Alvarez regarded as a threat of physical violence. Green now appeals, arguing that there was insufficient evidence to support the issuance of the protective order. We agree with Green and vacate the protective order.

## BACKGROUND[1]

### *Underlying Events*

¶2     Green is Canteros-Alvarez's older sister. A short time before the events at issue in this case, Canteros-Alvarez began using a car that Green owned. Green "absolutely hates" Canteros-Alvarez's husband (Husband), and Green became upset when she found out that Husband had also been driving the car. On July 20, 2024, Green and Canteros-Alvarez had a heated telephone conversation that spilled over into a text exchange. In one of the texts, Green wrote the following:

> I am pissed off. I pray to God that you swing first so that I can beat the shit out of you. I wish I could go back in time and punch you in the face because that's the only way that I might have been able to save you.

Sometime during the telephone conversation or in the texts (the record is a bit unclear on which), Green also told Canteros-Alvarez that when their mother died, Green was going to "spread her ashes all over" Canteros-Alvarez and Husband and that it would then "take forever" to "get her ashes out of [their] . . . stuff." After the July 20 conversation and texts, Canteros-Alvarez returned the car to Green without incident.

¶3     A short time later, Green informed Canteros-Alvarez that she was going to be petitioning for guardianship of Canteros-Alvarez's son because she thought "he was not safe" with Canteros-Alvarez. Green soon filed that petition, and a court commissioner held a hearing on it on September 4. Before the

---

1. When a party appeals a decision granting a protective order, "we consider the facts in a light most favorable to the district court's ruling, including its findings." *Mota v. Mota*, 2016 UT App 201, ¶ 2 n.2, 382 P.3d 1080 (quotation simplified).

hearing began, Green "confronted" Canteros-Alvarez, approaching her with a "whole stack of paperwork and a letter that she wrote to [the commissioner] about why she should get guardianship of [Canteros-Alvarez's] son." Green also told Husband that Canteros-Alvarez was cheating on him and that Green was "going to be so happy" when Canteros-Alvarez and Husband broke up.[2]

¶4 Later that same day, Green called police and asked them to perform a welfare check on Canteros-Alvarez's son, claiming that he was "malnourished and in unsafe living conditions." Officers arrived, talked to Canteros-Alvarez's son, looked around the house, and observed no problem. Officers told Canteros-Alvarez that it seemed like Green had used her call as a way of "harass[ing]" Canteros-Alvarez.

¶5 Soon thereafter, Green called the Utah Division of Child and Family Services (DCFS), claiming that Canteros-Alvarez's son was being abused and that the home was unsanitary. This call resulted in a home visit from DCFS, during which DCFS determined that things were "perfectly fine."

¶6 Around this same time, Canteros-Alvarez came to believe that Green had opened a Facebook account that used Husband's driver license photo as the profile picture and displayed his personal information. Canteros-Alvarez later alleged that law enforcement was investigating this incident.

*The Request for a Protective Order*

¶7 On September 6, Canteros-Alvarez filed a request for a protective order against Green under the Cohabitant Abuse Act

---

2. It's unclear from the record in this case what the result of the guardianship hearing was, but Green informs us in her appellate brief that she later abandoned her efforts to obtain a guardianship over Canteros-Alvarez's son.

(the Act).[3] In that request, which was filled out using a court form, Canteros-Alvarez said "the most recent abuse" occurred on September 4, and she then described her confrontation with Green at the guardianship hearing as well as Green's phone call to police. Canteros-Alvarez also said that Green had previously "been threatening" to "[p]unch [Canteros-Alvarez] in the face if that meant she could change [her] mind." Canteros-Alvarez additionally referred to the alleged Facebook account and Green's call to DCFS. And Canteros-Alvarez claimed that Green had threatened to call the Utah State Tax Commission and accuse Canteros-Alvarez and Husband of fraud.

¶8 In a section of the form that asked Canteros-Alvarez to describe "past abuse," Canteros-Alvarez stated that on July 20, Green had "threatened to '[p]unch [her] in the face and beat the shit out of [her].'" Canteros-Alvarez also checked a box indicating she had "[f]ear of imminent physical harm" and "fear that there [was] a substantial likelihood of imminent physical harm by [Green] against" her. Under that box, Canteros-Alvarez wrote that Green's "threats have become more erratic and severe considering the allegations she is threatening to file. She has already involved law enforcement and claimed this is not going to stop."

*The Protective Order Hearing*

¶9 The district court issued a temporary protective order on September 10, and the parties then participated in a hearing on September 24 in front of a court commissioner (the

---

3. Under the Act, "an individual who is 16 years old or older" and "resides or has resided in the same residence as the other party" is considered a "[c]ohabitant." Utah Code § 78B-7-102(7)(a)(i). Because the parties in this appeal are sisters who grew up in the same household, they qualify as "cohabitants," and neither party has challenged that point on appeal.

Commissioner). Canteros-Alvarez and Green each participated in that hearing pro se.

¶10    At the hearing, Canteros-Alvarez testified about the events described above. After doing so, she said, "I feel like it's not going to stop because [Green] has it in her mind that she's going to take my son, and I'm worried." For her part, Green testified that the "claims" that she had "threatened" Canteros-Alvarez were "simply not true." Green provided the Commissioner with a copy of the July 20 text message. Green testified that she had been "actively working to pursue guardianship" of Canteros-Alvarez's son, and she asserted that this was "the real reason" that Canteros-Alvarez was "upset."

¶11    At one point in the hearing, Canteros-Alvarez was attempting to introduce a piece of evidence when the Commissioner emphasized that the question before him was just "whether there was actual physical abuse or a threat of physical harm." In response, Canteros-Alvarez conceded that the only allegation that showed that there was a threat of physical harm was the July 20 text message.

¶12    At the close of the hearing, the Commissioner ruled from the bench. The Commissioner began by quoting language from the Act providing that "[a]ny cohabitant who has been subjected to abuse or domestic violence . . . may seek a protective order." *See* Utah Code § 78B-7-602(1). And the Commissioner cited statutory language defining "abuse" as "intentionally or knowingly placing another individual in reasonable fear of imminent physical harm." *See id.* § 78B-7-102(1).

¶13    The Commissioner then expressed his view that the only allegation that could satisfy this standard was the July 20 text message. In the Commissioner's view, the "other stuff" that had been alleged "might be something that potentially" could be at issue in some other kind of case but not "necessarily for [a] protective order case." Addressing the July 20 text, the

Commissioner observed that "the question" before him was whether this was "an actual threat . . . to do physical harm to" Canteros-Alvarez. The Commissioner then expressed his view that the text "approaches a line here." Continuing, he observed that the "question is whether it crosses it. The line is whether it . . . actually constitutes a threat to do something in the future." The Commissioner acknowledged the conditional nature of the threat, stating that the text was an "expression of anger" along with "some desire to engage in a physical altercation, but then it's . . . conditional." The Commissioner noted it was "a difficult proposition where this contingency [was] put in there."

¶14 Having made these observations, the Commissioner ruled that, "by the narrowest of margins," the text message "crosse[d] the line" because it was "the kind of thing that would cause somebody to have fear of physical harm." The Commissioner called this "a close call," but he nevertheless concluded that Canteros-Alvarez had "met her burden," and he accordingly recommended entry of the protective order as requested. Later that day, the district court accepted the recommendation and issued the protective order.

¶15 Green did not object to the Commissioner's recommendation. Instead, after it was issued, she filed a notice of appeal challenging "[t]he entire order or judgment, which was entered on September 24."

### ISSUE AND STANDARD OF REVIEW

¶16 On appeal, Green argues that there was insufficient evidence to show that Canteros-Alvarez was ever placed in reasonable fear of imminent harm. "When an appellant is essentially challenging the legal sufficiency of the evidence, a clearly erroneous standard of appellate review applies." *Hedgcock*

*v. Hedgcock*, 2009 UT App 304, ¶ 9, 221 P.3d 856 (quotation simplified).[4]

ANALYSIS

¶17 A court may issue a protective order under the Act "[i]f it appears . . . that domestic violence or abuse has occurred" or "that there is a substantial likelihood domestic violence or abuse will occur." Utah Code § 78B-7-603(1). In the ruling at issue, the Commissioner never referred to domestic violence, instead focusing on abuse, and the parties have followed suit on appeal. In challenging the issuance of the protective order, Green's principal argument is that there was insufficient evidence to show that abuse had either occurred or was substantially likely to occur. We agree.

¶18 Abuse is defined under the Act as "intentionally or knowingly causing or attempting to cause another individual physical harm or intentionally or knowingly placing another individual in reasonable fear of imminent physical harm." *Id.* § 78B-7-102(1). As noted, Canteros-Alvarez never alleged that Green had actually physically harmed her. Instead, Canteros-Alvarez alleged that Green had abused her by placing her in fear

---

4. Rule 108 of the Utah Rules of Civil Procedure sets forth the procedure by which a party can object to the recommendation of a court commissioner, but as noted, Green did not take advantage of this procedure to object. We've previously held, however, that "nothing in the plain language of [that] rule . . . makes the filing of an objection a prerequisite to the filing of an appeal or a necessary step to preserve any particular challenge to the entry of the order." *Mota*, 2016 UT App 201. Also, we note that the district court made no independent findings; instead, the findings at issue on appeal are those made by the Commissioner. Consistent with this sequence of events, we'll refer to those as having been made by the Commissioner throughout this opinion.

of "imminent physical harm." Focusing there, we note that one dictionary defines "imminent" as "ready to take place: happening soon."[5] Another dictionary defines "imminent" as "coming or likely to happen very soon."[6] Consistent with these definitions, our supreme court has defined the phrase "imminent danger" as "an immediate, real threat to one's safety" that is "impending" and "about to occur at any moment." *State v. Clara*, 2024 UT 10, ¶ 36, 546 P.3d 963 (quotation simplified).

¶19    The supreme court's decision in *State v. Berriel*, 2013 UT 19, 299 P.3d 1133, is instructive on the proper interpretation of an element that turns on whether force was "imminent." There, the defendant had been convicted of aggravated assault, and on appeal, the supreme court considered the question of whether the defendant was entitled to a defense-of-others instruction. *See id.* ¶¶ 1–2. To receive such an instruction, there needed to be some evidence that the defendant "reasonably believe[d] that force or a threat of force [was] necessary to defend . . . a third person against another person's imminent use of unlawful force." *Id.* ¶ 13 (quotation simplified). The evidence showed that the defendant had received a phone call from a friend in which the friend claimed that her boyfriend "had been hurting her." *Id.* ¶ 2 (quotation simplified). The defendant then drove to the house where his friend lived, at which point he confronted and then stabbed her boyfriend. *See id.* ¶¶ 3–5. On appeal, the supreme court concluded that while the initial phone call had suggested that the defendant's friend "was in imminent danger *at the time of the call*," it did not support the issuance of the requested instruction. *Id.* ¶ 16 (emphasis in original). This was so, in part, because the defendant had stabbed the victim "some time after

---

5. *Imminent*, Merriam-Webster, https://www.merriam-webster.com /dictionary/imminent [https://perma.cc/69T4-6R6S].

6. *Imminent*, Cambridge Dictionary, https://dictionary.cambridge.org /us/dictionary/english/imminent [https://perma.cc/2YSL-LJZG].

the phone call," at which point there was no longer any indication that the friend was still in imminent danger. *Id.*

¶20    Our recent decision in *State v. Farmer*, 2025 UT App 57, 569 P.3d 267, *cert. denied*, 574 P.3d 522 (Utah 2025), sheds further light on such questions. There, we considered whether the defendant should have received an instruction on the defense of compulsion. *See id.* ¶ 2. Such an instruction required a showing, in part, that the defendant was "coerced" to act "by the use or threatened imminent use of unlawful physical force upon him or a third person." *Id.* ¶ 55 (quotation simplified). Interpreting that requirement, we held that "it must appear that the threat had been communicated to the defendant" that he or another person "would be subjected to physical force presently." *Id.* (quotation simplified). And we further noted that "a threat directed to some indefinite time in the future is not an imminent threat for purposes of the defense of compulsion." *Id.* (quotation simplified).

¶21    Turning to this appeal, we recognize that *Berriel* and *Farmer* addressed the term "imminent" in other statutory contexts, but we still find these decisions persuasive as to how that same word should be interpreted for purposes of the Act. And against that backdrop, we turn to the evidence presented below.

¶22    As noted, the Commissioner based his decision on the July 20 text. In the Commissioner's view, this text was an "expression of anger" showing that Green had "some desire to engage in a physical altercation." Even accepting that premise, however, several things stand out to us.

¶23    First, in the text, Green never said that she was actually going to hit Canteros-Alvarez. Instead, what she said was she would *like* to hit her. These are different things.

¶24    Second, on the face of the text, Green expressed that desire in conditional terms. Again, Green said that she hoped Canteros-

Alvarez would "swing first so that [she could] beat the shit out of [her]." In this sense, what she said was that she was not going to hit Canteros-Alvarez unless Canteros-Alvarez hit her first, meaning that the threat of violence was dependent on an event that had not yet happened and might not happen. In our view, the conditional nature of this statement weakens any suggestion that the threatened violence was "impending" and "about to occur at any moment." *Clara*, 2024 UT 10, ¶ 36 (quotation simplified).

¶25 Third, because the text was sent while the two were some distance away from each other, it seems analogous to the situation involved in *Berriel*. And again, the supreme court there held that although the friend told the defendant, over the phone, that she was under a threat of violence "at the time of the call," this was distinguishable from a suggestion that she was still facing an "imminent" threat of danger at the time of the subsequent stabbing. *Berriel*, 2013 UT 19, ¶ 16 (emphasis omitted).

¶26 Fourth, there was no indication in the record that there was any history of violence between Canteros-Alvarez and Green, such that Canteros-Alvarez would have had some contextual reason to believe, based on past patterns, that physical violence was in any way imminent. In fact, in the ruling, the Commissioner noted that he wasn't "getting a sense [there had] been any actual physical contact, in terms of violent physical contact between the parties." Rather, he observed that the conflict between the sisters "[had] to do with the acrimony that [was] going on between the parties with respect to another matter involving guardianship, or . . . [Green's] belief that [Canteros-Alvarez] isn't a good parent" and her desire "to try to take" Canteros-Alvarez's son "in some sort of legal fashion."

¶27 Pulling all this together, we conclude that Green's text was decidedly indefinite as to both (1) whether Green actually intended to physically harm Canteros-Alvarez, and, if so, (2) when any such violence would occur. But as noted, the Act

requires proof of a threat of *imminent* physical harm. *See* Utah Code § 78B-7-102(1). Taking this statutory requirement at face value, we conclude that this text could not support the issuance of a protective order. Because the Commissioner's ruling was based on this text, we conclude that it should not have been issued.

## CONCLUSION

¶28    For the reasons set forth above, we vacate the protective order.[7]

————————

7. On appeal, Green also challenges the issuance of the protective order on several other grounds. In light of our conclusion that Canteros-Alvarez presented insufficient evidence of a necessary element, we need not address the other arguments.

We also acknowledge that the events Canteros-Alvarez described were understandably distressing, and our opinion should not be read to suggest that she had no other legal avenue available by which she could seek to protect herself from Green's actions. But Canteros-Alvarez sought protection under the Act, and as discussed, the Act requires proof of specific elements. We simply hold that Canteros-Alvarez did not sufficiently prove that she faced a reasonable fear of imminent physical harm, which is what was required for her to obtain relief under the statute she invoked.